UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH GARCIA,

                        Plaintiff,

    -v-

COUNTY OF WESTCHESTER; TOWN OF
MT. PLEASANT, NEW YORK; GEORGE N.
LONGWORTH, Commissioner–Sheriff; LOUIS
ALAGNO, Town of Mount Pleasant Police
Chief; POLICE OFFICER RONALD
BECKLEY; POLICE OFFICER PAUL J.
CUSANO; POLICE OFFICER RONALD
GAGNON; POLICE OFFICER BRIAN
BOSAN; LT. RUSSELL W. LOWENSTEIN;
JOHN DOES # 1–30,

                        Defendants.

Case No. 11-CV-7258 (KMK)

AMENDED
OPINION & ORDER

---

YVES DELPECHE,

                        Plaintiff,

    -v-

COUNTY OF WESTCHESTER; TOWN OF
MT. PLEASANT, NEW YORK;
COMMISSIONER GEORGE N.
LONGWORTH, Westchester County Dept. of
Public Safety; LOUIS ALAGNO, Town of
Mount Pleasant, New York Police Chief;
POLICE OFFICER RONALD BECKLEY;
POLICE OFFICER RONALD GAGNON;
POLICE OFFICER BRIAN BOSAN; LT.
RUSSELL W. LOWENSTEIN; JOHN DOES #
1–30,

                        Defendants.

Case No. 11-CV-7260 (KMK)

MARTIN LaROCHE,

                Plaintiff,

   -v-

COUNTY OF WESTCHESTER; TOWN OF
MT. PLEASANT, NEW YORK; GEORGE N.
LONGWORTH, Commissioner–Sheriff; LOUIS
ALAGNO, Town of Mt. Pleasant Police Chief;
RONALD BECKLEY, Police Officer;
RONALD GAGNON, Police Officer; JOHN
DOES # 1–30; CARL CASTAGNA, Police
Officer; JUSTIN JACOBSON, Police Officer,

                Defendants.

Case No. 11-CV-7261 (KMK)

REBECCA GALLO,

                Plaintiff,

   -v-

COUNTY OF WESTCHESTER; TOWN OF
MT. PLEASANT, NEW YORK;
COMMISSIONER–SHERIFF GEORGE N.
LONGWORTH; LOUIS ALAGNO, Town of
Mount Pleasant Police Chief; RONALD
BECKLEY, Police Officer; RONALD
GAGNON, Police Officer; POLICE OFFICER
JOHN DOE; JOHN DOES # 1–30; CARL
CASTAGNA, Police Officer,

                Defendants.

Case No. 11-CV-7262 (KMK)

DANIEL PARKER,

                    Plaintiff,                    Case No. 11-CV-7264 (KMK)

    -v-

COUNTY OF WESTCHESTER; TOWN OF
MOUNT PLEASANT, NEW YORK; GEORGE
N. LONGWORTH, Commissioner–Sheriff;
LOUIS ALAGNO, Town of Mount Pleasant,
New York Police Chief; RONALD BECKLEY,
Police Officer; RONALD GAGNON, Police
Officer; BRIAN BOSAN, Police Officer; LT.
RUSSELL W. LOWENSTEIN; JOHN DOES #
1–30; CARL CASTAGNA, Police Officer,

                    Defendants.

---

DESMOND HINDS,

                    Plaintiff,                    Case No. 11-CV-7265 (KMK)

    -v-

COUNTY OF WESTCHESTER; VILLAGE OF
PLEASANTVILLE, NEW YORK; TOWN OF
MOUNT PLEASANT, NEW YORK; GEORGE
N. LONGWORTH, Commissioner–Sheriff;
ANTHONY CHIARLITTI, Village of
Pleasantville Former Police Chief; LOUIS
ALAGNO, Town of Mount Pleasant, New York
Police Chief; AARON HESS, Police Officer;
RONALD BECKLEY, Police Officer;
RONALD GAGNON, Police Officer; MARCO
A. MENDOZA, Detective; MARTIN
GREENBERG, Detective; JOHN DOES # 1–30;
JUSTIN JACOBSON, Police Officer,

                    Defendants.

JOSEPH ROMANICK,

                        Plaintiff,

    -v-

COUNTY OF WESTCHESTER; TOWN OF
MOUNT PLEASANT, NEW YORK;
COMMISSIONER GEORGE N.
LONGWORTH; LOUIS ALAGNO, Town of
Mount Pleasant, New York Police Chief;
POLICE OFFICER RONALD BECKLEY;
POLICE OFFICER RONALD GAGNON;
DETECTIVE MARCO A. MENDOZA;
DETECTIVE MATTHEW F. BROWN;
DETECTIVE MARTIN GREENBERG;
POLICE OFFICER GEORGE W. WINSMAN;
JOHN DOES # 1–30,

                      Defendants.

Case No. 11-CV-7267 (KMK)

Appearances:

Bonita E. Zelman, Esq.
Law Offices of Bonita Zelman
New York, NY
*Counsel for Plaintiffs*

David S. Yohay, Esq.
LaCheen Dixon Wittels & Greenberg, LLP
Philadelphia, PA
*Counsel for Plaintiffs*

Joan LeGraw, Esq.
Legal Advocacy & Resource Center
Boston, MA
*Counsel for Plaintiffs*

Paula J. Kelly, Esq.
Law Offices of Paula Johnson Kelly
New Rochelle, NY
*Counsel for Plaintiffs*

Drew W. Sumner, Esq.
Carl S. Sandel, Esq.
Kenneth E. Pitcoff, Esq.
Rebecca J. Rosedale, Esq.
Morris Duffy Alonso & Faley
New York, NY
*Counsel for Defendants County of Westchester, Town of Mount Pleasant, New York,*
*Commissioner George N. Longworth, Louis Alagno, Police Officer Ronald Beckley, Police*
*Officer Ronald Gagnon, Police Officer Brian Bosan, Lt. Russell W. Lowenstein, Carl Castagna,*
*Justin Jacobson, Marco A. Mendoza, Martin Greenberg, Matthew F. Brown, and George W.*
*Winsman*

James A. Randazzo, Esq.
Caitlin G. Scheir, Esq.
Gaines, Novick, Ponzini, Cossu & Venditti, LLP
White Plains, NY
*Counsel for Defendants Village of Pleasantville, New York, and Anthony Chiarlitti*

Brian S. Sokoloff, Esq.
David A. Gold, Esq.
Leo Dorfman, Esq.
Sokoloff Stern LLP
Carle Place, NY
*Counsel for Defendant Aaron Hess*

KENNETH M. KARAS, District Judge:

Plaintiffs Joseph Garcia, Yves Delpeche, Martin LaRoche, Rebecca Gallo, Daniel Parker, Desmond Hinds, and Joseph Romanick (collectively, "Plaintiffs"), brought these Actions against the County of Westchester, the Village of Pleasantville, the Town of Mount Pleasant, George N. Longworth, Anthony Chiarlitti, Louis Alagno, Aaron Hess, Ronald Beckley, Ronald Gagnon, Brian Bosan, Russell W. Lowenstein, Carl Castagna, Marco A. Mendoza, Matthew Brown, Martin Greenberg, George Winsman, Justin Jacobson, and John Does # 1–30 (collectively, "Defendants"), alleging various violations of their state and federal rights arising out of an incident in the evening on October 16, 2010 in which two other individuals, D.J. Henry and Brandon Cox, were shot by Defendant Officer Aaron Hess in the parking lot of a shopping center. Plaintiffs have brought a number of claims, including, among others, false arrest,

excessive force, malicious prosecution, and intentional infliction of emotional distress. Before the Court are Defendants' Motions for Summary Judgment. (*See* Dkt. No. 291, 11-CV-7258 Dkt.; Dkt. No. 244, 11-CV-7260 Dkt.; Dkt. No. 240, 11-CV-7261 Dkt.; Dkt. No. 229, 11-CV-7262 Dkt.; Dkt. No. 254, 11-CV-7264 Dkt.; Dkt. Nos. 254, 258, 262, 11-CV-7265 Dkt.; Dkt. No. 243; 11-CV-7267 Dkt.) For the following reasons, the Motions are granted in part and denied in part.

## I. Background

### A. Factual Background

Officer Hess's encounter with D.J. Henry, Brandon Cox, and Plaintiff Desmond Hinds is already the subject of an Opinion & Order issued by this Court on September 26, 2017 in related the case brought by Brandon Cox. (*See* Op. & Order ("Cox Op.") (Dkt. No. 131, 11-CV-6516 Dkt.).) That encounter, in which Officer Hess fired several shots into the front windshield of a car driven by D.J. Henry, with Brandon Cox in the passenger seat and Desmond Hinds in the backseat, sets the background for many of the claims raised in these Actions. The details of that encounter, however, are not material to the disposition of these Motions, except with respect to Hinds. For that reason, and to avoid repetition, the Court will not repeat the facts giving rise to the interaction between Hess and the vehicle driven by D.J. Henry. Except where noted, the Court will assume here the same version of facts set forth by Plaintiff and accepted as true in the Cox Opinion.

Moreover, because this case comes before the Court on Defendants' Motions for Summary Judgment, the Court will recite only either undisputed facts or those set forth by Plaintiffs and supported by the record. The Court will not, except as noted, set forth Defendants' version of the facts where disputed.

### 1. Allegations Regarding Joseph Garcia

On the evening of October 16, 2010, Plaintiff Joseph Garcia was a student at Pace University and a member of the football team. (*See* Decl. of Bonita E. Zelman ("Garcia Zelman Decl.") Ex. 4 ("Garcia 50-h Testimony"), at 5–6 (Dkt. No. 302, 11-CV-7258 Dkt.); *see also* Pl. Joseph Garcia's Statement of Additional Disputed Facts Pursuant to Local Rule 56.1(B) ("Pl.'s Garcia 56.1") ¶ 1 (Dkt. No. 304, 11-CV-7258 Dkt.); County & Town Defs.' Resp. to Pl.'s Counter 56.1 Statement ("Defs.' Garcia 56.1 Resp.") ¶ 1 (Dkt. No. 310, 11-CV-7258 Dkt.).) That evening was the night of the homecoming game, and after the game, Garcia went to Finnegan's bar in Mount Pleasant, New York. (*See* Garcia 50-h Testimony 10, 17–20; Pl.'s Garcia 56.1 ¶ 1; Defs.' Garcia 56.1 Resp. ¶ 1.) At some point in the night, the staff at Finnegan's announced the bar was closing for reasons unrelated to Garcia or any of his friends. As Garcia was leaving, he heard three or four gunshots. (*See* Garcia Zelman Decl. Ex. 1 ("Garcia Dep."), at 187, 191–92; *see also* Pl.'s Garcia 56.1 ¶ 2; Defs.' Garcia 56.1 Resp. ¶ 2.)

After Garcia left Finnegan's, he saw approximately 15 police officers and five or six police vehicles outside. (*See* Garcia 50-h Testimony 25; *see also* Pl.'s Garcia 56.1 ¶ 3; Defs.' Garcia 56.1 Resp. ¶ 3.) Garcia looked down the roadway and saw his friend, D.J. Henry, lying in the street, and also saw Henry's car in the middle of the street. (*See* Garcia 50-h Testimony 26, 28; *see also* Pl.'s Garcia 56.1 ¶ 4; Defs.' Garcia 56.1 Resp. ¶ 4.) As Garcia approached Henry's vehicle, he asked a police officer, "what happened?" to which the police officer, who had a gun in his hands, responded, "get the fuck back." (*See* Garcia Dep. 196–97, 200; Pl.'s Garcia 56.1 ¶ 6; Defs.' Garcia 56.1 Resp. ¶ 6.) Garcia complied and moved back onto the sidewalk. (*See* Garcia Dep. 197–98; *see also* Pl.'s Garcia 56.1 ¶ 6; Defs.' Garcia 56.1 Resp. ¶ 6.)

At that time, Garcia saw his friend, Plaintiff Yves Delpeche, standing on the sidewalk with his back against the wall and his arms raised above his head while four officers were pointing their weapons at him.  (*See* Garcia Dep. 235–36; Garcia 50-h Testimony 41–42; *see also* Pl.'s Garcia 56.1 ¶ 8; Defs.' Garcia 56.1 Resp. ¶ 8.)  Garcia could see red dots from Tasers aimed at Delpeche's chest and head.  (*See* Garcia 50-h Testimony 43; *see also* Pl.'s Garcia 56.1 ¶ 8; Defs.' Garcia 56.1 Resp. ¶ 8.)  Garcia walked toward Delpeche but, as he was doing so, he was grabbed by Defendant Officer Cusano, slammed into a brick wall, punched, and Tased in the back.  (*See* Garcia Dep. 246–47; Garcia Zelman Decl. Ex. 6 ("Cusano Dep."), at 125–27; *see also* Pl.'s Garcia 56.1 ¶ 9; Defs.' Garcia 56.1 Resp. ¶ 9.)[1]  Garcia was handcuffed and arrested by Officer Cusano because of his presence in the area where Delpeche and Defendant Officer Bosan, who was in the process of arresting Delpeche, were standing.  (*See* Cusano Dep. 40–41, 126–28; *see also* Pl.'s Garcia 56.1 ¶ 10; Defs.' Garcia 56.1 Resp. ¶ 10.)  Officer Bosan testified that he could not see everything that happened between Garcia and Officer Cusano, but did note that he witnessed a verbal exchange (not described by either Garcia or Officer Cusano in their testimony) and then saw the two struggle and go to the ground.  (*See* Garcia Zelman Decl. Ex. 2, at 347; *see also* Pl.'s Garcia 56.1 ¶¶ 12–13; Defs.' Garcia 56.1 Resp. ¶¶ 12–13.)

---

[1] With respect to whether Garcia positioned himself between Delpeche and the officers or whether he was still a couple of feet away, although Garcia himself agreed at his deposition that he "put [himself] between the four police officers and [Delpeche]," (Garcia Dep. 244–45), Officer Cusano testified that he did not "see [Garcia] get right next to [Delpeche] and try to stand in front of him," (Cusano Dep. 126).  While a nonmovant may not create a genuine issue of material fact at summary judgment by contradicting his own deposition testimony by way of an affidavit, *see Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991), "a party's deposition testimony as to a given fact does not foreclose a trial or an evidentiary hearing where that testimony is contradicted by evidence other than the deponent's subsequent affidavit," *Delmage ex rel. Palazzo v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000).  Accordingly, Garcia is entitled to rely on Officer Cusano's testimony, rather than his own to the contrary, that Officer Cusano did not see Garcia step between any officers and Delpeche.

Garcia was eventually taken to the police station where he was placed in a holding cell until the morning. (*See* Garcia Dep. 279; *see also* Pl.'s Garcia 56.1 ¶ 17; Defs.' Garcia 56.1 Resp. ¶ 17.) Garcia was later charged with disorderly conduct and obstructing governmental administration. (*See* Garcia Zelman Decl. Ex. 5; *see also* Pl.'s Garcia 56.1 ¶ 22; Defs.' Garcia 56.1 Resp. ¶ 22.) Officer Bosan is listed as the complainant on the Superseding Misdemeanor Information. (*See* Garcia Zelman Decl. Ex. 5; *see also* Pl.'s Garcia 56.1 ¶ 22; Defs.' Garcia 56.1 Resp. ¶ 22.) As a result of the charges levied against him, Garcia was forced to make four court appearances. (*See* Cox 50-h Testimony 78; *see also* Pl.'s Garcia 56.1 ¶ 43; Defs.' Garcia 56.1 Resp. ¶ 43.) The District Attorney's Office ultimately moved to dismiss the charges against Garcia (and others) in the interest of justice, saying:

> In sum, the continued prosecution of defendants, resulting in multiple future criminal trials, would be inimical to a fair, merciful and just result, as (1) defendants' criminal conduct was motivated by their emotional (however misguided under the circumstances) desire to assist their friend who was tragically shot, as well as anger and frustration at that devastating event; (2) defendants' actions, when viewed as an emotional reaction to the immediately preceding unique event of the tragic death of a friend reasonably suggests that their conduct constituted isolated instances of wrongdoing committed under unusually stressful circumstances, conduct unlikely to occur again (and thus significantly reducing the need to subject defendants to a criminal sentence); (3) defendants' offenses did not result in any physical injuries; and (4) the defendants' backgrounds support the view that these cases represent isolated incidents of poor behavior under unique circumstances (i.e., their lack of prior criminal convictions, their relatively young age, and their status (at the time of the events) as contributing members to the local community and matriculating college students at Pace University).

(Decl. of Drew W. Sumner ("Garcia Sumner Decl.") Ex. D, at 14–15 (Dkt. No. 293, 11-CV-7258 Dkt.).) The Town Court granted the motion dismissing the charges, (*see* Garcia Sumner Decl. Ex. E), saying that the "gentlemen who came in [the courtroom] presumed innocent will leave here innocent," (Garcia Zelman Decl. Ex. 3, at 11).

<u>2. Allegations Regarding Yves Delpeche</u>

On the evening of October 16, 2010, Yves Delpeche was a student at Pace University and a member of the football team. (Decl. of Bonita E. Zelman ("Delpeche Zelman Decl.") Ex. 1 ("Delpeche Dep."), at 53 (Dkt. No. 258, 11-CV-7260 Dkt.); *see also* Pl. Yves Delpeche's Statement of Additional Disputed Facts Pursuant to Local Rule 56.1(B) ("Pl.'s Delpeche 56.1") ¶ 1 (Dkt. No. 256, 11-CV-7260 Dkt.); County & Town Defs.' Resp. to Pl.'s Counter 56.1 Statement ("Defs.' Delpeche 56.1 Resp.") ¶ 1 (Dkt. No. 264, 11-CV-7260 Dkt.).) Like Garcia, he was at Finnegan's after the homecoming game. (*See* Delpeche Dep. 108; *see also* Pl.'s Delpeche 56.1 ¶ 1; Defs.' Delpeche 56.1 Resp. ¶ 1.) At some point after Henry had already departed, Delpeche attempted to exit Finnegan's, but was not able to do so. (*See* Delpeche Dep. 129–31; *see also* Pl.'s Delpeche 56.1 ¶ 2; Defs.' Delpeche 56.1 Resp. ¶ 2.) The lights in Finnegan's eventually came on and Delpeche was able to leave when the door opened; it was then that he heard someone say there had been a shooting outside. (*See* Delpeche Dep. 131; *see also* Pl.'s Delpeche 56.1 ¶ 2; Defs.' Delpeche 56.1 Resp. ¶ 2.)

When Delpeche got outside of Finnegan's, he saw people on the sidewalk and in the parking lot crying and screaming, saying that someone had been shot. (*See* Delpeche Dep. 139; *see also* Defs.' Local Rule 56.1 Statement ("Defs.' Delpeche 56.1") ¶ 3 (Dkt. No. 246, 11-CV-7260 Dkt.); Pl.'s Resp. to Defs.' Local Rule 56.1 Statement ("Pl.'s Delpeche 56.1 Resp.") ¶ 3 (Dkt. No. 255; 11-CV-7260 Dkt.).) Matt Arciero, a Finnegan's bartender and football teammate, approached Delpeche and warned him not to go over to a particular area. (*See* Delpeche Dep. 139–40; *see also* Defs.' Delpeche 56.1 ¶ 4; Pl.'s Delpeche 56.1 Resp. ¶ 4.) Despite Arciero's warning, Delpeche, who saw what he recognized as Henry's vehicle in the middle of the road, began to approach that area of the roadway. (*See* Delpeche Dep. 141; *see also* Defs.' Delpeche

56.1 ¶ 5; Pl.'s Delpeche 56.1 Resp. ¶ 5.)  Although Delpeche could see Henry's legs on the

ground, (*see* Delpeche Dep. 141), he could not see the upper body or face because a police

officer stepped forward and put a gun in his face, (*see id.* at 142; *see also* Pl.'s Delpeche 56.1

¶ 5; Defs.' Delpeche 56.1 Resp. ¶ 5).  The police officer who put the gun in Delpeche's face told

him to "[b]ack the fuck up."  (Delpeche Dep. 143; *see also* Pl.'s Delpeche 56.1 ¶ 6; Defs.'

Delpeche 56.1 Resp. ¶ 6.)  Delpeche was in shock and "froze" upon having a gun put in his face;

another student, Joseph Fasano, pulled Delpeche back onto the sidewalk, near a wall.  (*See*

Delpeche Dep. 165–66; *see also* Pl.'s Delpeche 56.1 ¶ 7; Defs.' Delpeche 56.1 Resp. ¶ 7.)

After Fasano let go of Delpeche, Delpeche stayed on the sidewalk, but moved a couple of

feet laterally toward a different police officer.  (*See* Delpeche Dep. 186, 189.)  The officer saw

Delpeche and drew his gun, pointing it at Delpeche, and he moved closer toward Delpeche as

Delpeche moved along the sidewalk.  (*See id.* at 189.)  Delpeche told the officer that he was

unarmed and just wanted to ask questions about his friend.  (*See id.* at 190–91; *see also* Pl.'s

Delpeche 56.1 ¶ 9; Defs.' Delpeche 56.1 Resp. ¶ 9.)  The police officer told Delpeche to "shut

the fuck up."  (*See* Delpeche Dep. 190–91; *see also* Pl.'s Delpeche 56.1 ¶ 9; Defs.' Delpeche

56.1 Resp. ¶ 9.)  Delpeche continued, saying that he had done nothing wrong and just wanted to

know what had happened to his friend (Henry); the officer continued to tell Delpeche to "shut the

fuck up."  (Delpeche Dep. 191; *see also* Pl.'s Delpeche 56.1 ¶ 10; Defs.' Delpeche 56.1 Resp.

¶ 10.)  Officers in the vicinity became aware of the interaction and Delpeche began to see more

guns pointed in his direction.  (*See* Delpeche Dep. 191; *see also* Pl.'s Delpeche 56.1 ¶ 10; Defs.'

Delpeche 56.1 Resp. ¶ 10.)  Delpeche continued to tell the officer that he was making a mistake

and that he was just wanted to find out what had happened to Henry.  (*See* Delpeche Dep. 195.)

Delpeche saw red dots appear on his chest and he believed that as many as four weapons were

pointed at him.  (*See* Delpeche Dep. 198; *see also* Pl.'s Delpeche 56.1 ¶ 15; Defs.' Delpeche 56.1 Resp. ¶ 15.)

At that moment, Delpeche was Tasered and he collapsed to the ground.  (*See* Delpeche Dep. 209, 553; *see also* Defs.' Delpeche 56.1 ¶ 17; Pl.'s Delpeche 56.1 Resp. ¶ 17; Pl.'s Delpeche 56.1 ¶ 16; Defs.' Delpeche 56.1 Resp. ¶ 17.)  Police officers handcuffed Delpeche after he collapsed, picked him up, and escorted him to a police vehicle.  (*See* Delpeche Dep. 214, 565–66; *see also* Defs.' Delpeche 56.1 ¶ 18; Pl.'s Delpeche 56.1 Resp. ¶ 18.)  After being seen by an ambulance attendant, Delpeche was taken to the emergency room where the Taser prongs were removed from his abdomen.  (*See* Delpeche Dep. 283, 329, 568–69; *see also* Defs.' Delpeche 56.1 ¶ 20; Pl.'s Delpeche 56.1 Resp. ¶ 20.)  Delpeche later learned that the officer who had Tasered him was Officer Bosan.  (*See* Delpeche Dep. 558; *see also* Pl.'s Delpeche 56.1 ¶ 27; Defs.' Delpeche 56.1 Resp. ¶ 27.)

Officer Bosan had arrived on the scene on October 16, 2010 in response to a call that a fight was in progress at Finnegan's.  (*See* Delpeche Zelman Decl. Ex. 3 ("Bosan Dep."), at 190; *see also* Pl.'s Delpeche 56.1 ¶ 33; Defs.' Delpeche 56.1 Resp. ¶ 33.)  When Officer Bosan arrived, he saw Hess sitting on the side of the road and saw a blond-haired woman with him. (*See* Bosan Dep. 195–201.)  Officer Bosan and other officers established a perimeter at the scene, instructing students to stay back.  (*See* Bosan Dep. 231; *see also* Pl.'s Delpeche 56.1 ¶ 40; Defs.' Delpeche 56.1 Resp. ¶ 40.)  Officer Bosan testified that he observed Delpeche being told to move on several times prior to the encounter in which he was Tasered.  (*See* Bosan Dep. 271; *see also* Defs.' Delpeche 56.1 ¶ 10; Pl.'s Delpeche 56.1 Resp. ¶ 10.)

Delpeche was charged by way of a Misdemeanor Information with obstructing governmental administration in the second degree.  (*See* Delpeche Zelman Decl. Ex. 6.)  A

Superseding Misdemeanor Information was thereafter filed, with Officer Bosan listed as the complainant, charging Delpeche with resisting arrest, obstructing governmental administration in the second degree, and disorderly conduct refusing to move on. (*See* Delpeche Zelman Decl. Ex. 7.) As with Garcia, the District Attorney's Office moved to dismiss the charges in the interest of justice and that application was granted. (*See* Defs.' Delpeche 56.1 ¶¶ 24–25; Pl.'s Delpeche 56.1 Resp. ¶¶ 24–25.)

### 3. Allegations Regarding Martin LaRoche

Plaintiff Martin LaRoche was at Finnegan's the night of October 16, 2010. (*See* Decl. of Bonita E. Zelman ("LaRoche Zelman Decl.") Ex. 2 ("LaRoche Dep."), at 432 (Dkt. No. 251, 11-CV-7261 Dkt.); *see also* Pl. Martin LaRoche's Statement of Additional Disputed Facts Pursuant to Local Rule 56.1(B) ("Pl.'s LaRoche 56.1") ¶ 1 (Dkt. No. 253, 11-CV-7261 Dkt.); County & Town Defs.' Resp. to Pl.'s Counter 56.1 Statement ("Defs.' LaRoche 56.1 Resp.") ¶ 1 (Dkt. No. 258, 11-CV-7261 Dkt.).) While he was in Finnegan's, someone ran inside and said, "Call an ambulance, someone has been shot." (LaRoche Zelman Decl. Ex. 1, at 35; *see also* Pl.'s LaRoche 56.1 ¶ 1; Defs.' LaRoche 56.1 Resp. ¶ 1.) LaRoche and Delpeche rushed out the door and went to go see what was happening. (*See* LaRoche Dep. 446; *see also* Pl.'s LaRoche 56.1 ¶ 2; Defs.' LaRoche 56.1 Resp. ¶ 2.)

Upon exiting Finnegan's, LaRoche saw his friend, Desmond Hinds, laying on the ground behind Henry's car and a police officer holding a gun in his right hand to the back of Hinds's head. (*See* LaRoche Dep. 447–49, 469; *see also* Pl.'s LaRoche 56.1 ¶ 3; Defs.' LaRoche 56.1 Resp. ¶ 3.) It appeared to LaRoche that Hinds was being handcuffed, as the police officer was placing Hinds's arms behind his back. (*See* LaRoche Dep. 471, 473; *see also* Pl.'s LaRoche 56.1 ¶ 4; Defs.' LaRoche 56.1 Resp. ¶ 4.) Although LaRoche did not know who the police officer

was, Defendant Officer Justin Jacobsen testified that after Henry's vehicle came to a stop, he ran up to the passenger's side of the vehicle and told Defendant Officer Carl Castagna that they needed to handcuff the parties in the vehicle. (*See* LaRoche Zelman Decl. Ex. 3 ("Jacobsen Dep."), at 47–52; *see also* Pl.'s LaRoche 56.1 ¶ 5; Defs.' LaRoche 56.1 Resp. ¶ 5.) Officer Jacobsen yelled at both Hinds and Cox to get down on the ground, after which he proceeded to holster his gun and pull Hinds's hands behind his back to handcuff him. (*See* Jacobsen Dep. 413–14, 417, 420; *see also* Pl.'s LaRoche 56.1 ¶ 6; Defs.' LaRoche 56.1 Resp. ¶ 6.) Meanwhile, Defendant Officer Ronald Gagnon went to the driver's side of the car and removed Henry from the vehicle. (*See* Jacobsen Dep. 151; *see also* Pl.'s LaRoche 56.1 ¶ 7; Defs.' LaRoche 56.1 Resp. ¶ 7.) For his part, Officer Castagna assisted Officer Jacobsen by holding his leg across the side of Hinds's body until he was handcuffed. (*See* LaRoche Zelman Decl. Ex. 4 at 108–09; *see also* Pl.'s LaRoche 56.1 ¶ 9; Defs.' LaRoche 56.1 Resp. ¶ 9.)

Seeing that his friend was being handcuffed, LaRoche approached the police officer handcuffing Hinds (Officer Jacobsen) and told him that there had "been a mistake," believing that the police officer had made a mistake in apprehending Hinds. (*See* LaRoche Dep. 475; *see also* Pl.'s LaRoche 56.1 ¶ 12; Defs.' LaRoche 56.1 Resp. ¶ 12.) LaRoche got close enough to speak with Officer Jacobsen and voice his concerns; he could still see the gun pointed at the back of Hinds's head. (*See* LaRoche Dep. 477–78; *see also* Pl.'s LaRoche 56.1 ¶ 13; Defs.' LaRoche 56.1 Resp. ¶ 13.) After LaRoche spoke, however, Officer Jacobsen pointed his gun at LaRoche and said, "[b]ack the fuck up, or you'll be next." (LaRoche Dep. 475–76; *see also* Pl.'s LaRoche 56.1 ¶ 14; Defs.' LaRoche 56.1 Resp. ¶ 14.) LaRoche immediately backed away from Officer Jacobsen, and Officer Jacobsen redirected his attention to Hinds. (*See* LaRoche Dep. 477–79; *see also* Pl.'s LaRoche 56.1 ¶ 14; Defs.' LaRoche 56.1 Resp. ¶ 14.) As LaRoche backed away,

Hinds asked him to "[g]o check on D.J. [Henry]." (LaRoche Dep. 479; *see also* Pl.'s LaRoche 56.1 ¶ 16; Defs.' LaRoche 56.1 Resp. ¶ 16.)

LaRoche went to go check on Henry by approaching the passenger's side of the vehicle (without getting closer to Hinds), but some other police officers again told LaRoche, "back the fuck up." (*See* LaRoche Dep. 479–81; *see also* Pl.'s LaRoche 56.1 ¶ 16; Defs.' LaRoche 56.1 Resp. ¶ 16.) From where he was on the passenger's side, approximately two feet away from the vehicle, LaRoche could see over the top of the car and could see that Henry's body was laying on the ground on the driver's side of the vehicle. (*See* LaRoche Dep. 483–85; *see also* Pl.'s LaRoche 56.1 ¶ 17; Defs.' LaRoche 56.1 Resp. ¶ 17.) LaRoche backed up toward the sidewalk and walked around the vehicle to get closer to Henry, trying to avoid Hinds and the areas where police officers were. (*See* LaRoche Dep. 485–87; *see also* Pl.'s LaRoche 56.1 ¶ 18; Defs.' LaRoche 56.1 Resp. ¶ 18.) At that time, LaRoche got a full view of Henry's body as it was turned over and could see blood on his shirt. (*See* LaRoche Dep. 484–88.)

As LaRoche headed back toward Finnegan's, he was approached by another police officer, now believed by LaRoche to be Officer Castagna. (*See* LaRoche Dep. 721–22; *see also* Pl.'s LaRoche 56.1 ¶ 20; Defs.' LaRoche 56.1 Resp. ¶ 20.) Officer Castagna pointed his gun at LaRoche in a "two-hand combat stance" and told LaRoche to "[b]ack the fuck up." (LaRoche Dep. 721–22; *see also* Pl.'s LaRoche 56.1 ¶ 20; Defs.' LaRoche 56.1 Resp. ¶ 20.) Although LaRoche claims in his 56.1 statement that he complied with Officer Castagna's directions, the cited pages do not support that testimony. (*See* Pl.'s LaRoche 56.1 ¶ 20 (citing LaRoche Dep. 721–22, 729–31).)

LaRoche walked to the area where Delpeche was on the sidewalk and could see that Delpeche was backing away from the curb and farther onto the sidewalk. (*See* LaRoche Dep.

500, 693; *see also* Pl.'s LaRoche 56.1 ¶ 21; Defs.' LaRoche 56.1 Resp. ¶ 21.)  When LaRoche

was a few feet away from Delpeche, he could see that Delpeche was backing away from four or

five police officers who were within about five feet of Delpeche and had their weapons drawn.

(*See* LaRoche Dep. 694; *see also* Pl.'s LaRoche 56.1 ¶ 22; Defs.' LaRoche 56.1 Resp. ¶ 22.)  At

the time LaRoche reached where Delpeche was, the officers had their weapons pointed at

LaRoche as well, and both he and Delpeche put their hands up and backed away until their backs

were against the wall of a store.  (*See* LaRoche Dep. 697–98; *see also* Pl.'s LaRoche 56.1 ¶ 23;

Defs.' LaRoche 56.1 Resp. ¶ 23.)  It was at this time that Delpeche was Tasered by a police

officer.  (*See* LaRoche Dep. 500–02, 699; *see also* Pl.'s LaRoche 56.1 ¶ 24; Defs.' LaRoche 56.1

Resp. ¶ 24.)  LaRoche was not Tasered and was not touched by any police officer while he was

in the shopping center.  (*See* LaRoche Dep. 730; *see also* Pl.'s LaRoche 56.1 ¶ 8; Defs.'

LaRoche 56.1 Resp. ¶ 8.)

### 4.  Allegations Regarding Rebecca Gallo

At the time of the events in question, Plaintiff Rebecca Gallo was a 20-year-old student at

Pace University.  (*See* Decl. of Bonita E. Zelman ("Gallo Zelman Decl.") Ex. 1 ("Gallo 50-h

Testimony"), at 5–6 (Dkt. No. 244, 11-CV-7262 Dkt.); *see also* Pl. Rebecca Gallo's Statement of

Additional Disputed Facts Pursuant to Local Rule 56.1(B) ("Pl.'s Gallo 56.1") ¶ 1 (Dkt. No. 246,

11-CV-7262 Dkt.); County & Town Defs.' Resp. to Pl.'s Counter 56.1 Statement ("Defs.' Gallo

56.1 Resp.") ¶ 1 (Dkt. No. 251, 11-CV-7262 Dkt.).)  On the evening of October 16, 2010, Gallo

was standing outside of Finnegan's when she heard a screeching sound followed by a series of

gunshots coming from her right side.  (*See* Gallo Zelman Decl. Ex. 2 ("Gallo Dep."), at 170, 178;

*see also* Pl.'s Gallo 56.1 ¶¶ 2–3; Defs.' Gallo 56.1 Resp. ¶¶ 2–3.)  Gallo ran on the sidewalk in

the direction of the gunshots, where she saw Hinds laying on the ground already in handcuffs.

(*See* Gallo Dep. 183–84, 193; *see also* Pl.'s Gallo 56.1 ¶ 4; Defs.' Gallo 56.1 Resp. ¶ 4.)  Gallo moved to where Hinds was laying, half on the sidewalk and half in the roadway, where nobody else was standing; Gallo was as close as five feet to Hinds.  (*See* Gallo Dep. 185, 188; *see also* Pl.'s Gallo 56.1 ¶ 5; Defs.' Gallo 56.1 Resp. ¶ 5.)  When Gallo got near Hinds, she called out his name several times.  (*See* Gallo Dep. 194; *see also* Pl.'s Gallo 56.1 ¶ 7; Defs.' Gallo 56.1 Resp. ¶ 7.)

At this point in time, a police officer, now believed by Gallo to be Officer Castagna, approached Gallo and others on the sidewalk with his gun drawn.  (*See* Gallo Dep. 195; *see also* Pl.'s Gallo 56.1 ¶ 8; Defs.' Gallo 56.1 Resp. ¶ 8.)  Officer Castagna had the gun pointed at Gallo's face and twice instructed her to "[g]et the fuck back."  (Gallo Dep. 201; *see also* Pl.'s Gallo 56.1 ¶ 8; Defs.' Gallo 56.1 Resp. ¶ 8.)  Gallo, believing that Officer Castagna might shoot her, froze in the face of the weapon, backed up, and collapsed on the sidewalk.  (*See* Gallo Dep. 201, 207–209; *see also* Pl.'s Gallo 56.1 ¶¶ 11–12; Defs.' Gallo 56.1 Resp. ¶¶ 11–12.)  Gallo's boyfriend held her as she was falling down.  (*See* Gallo Dep. 210–13; *see also* Pl.'s Gallo 56.1 ¶ 14; Defs.' Gallo 56.1 Resp. ¶ 14.)  When she collapsed to the ground, Gallo ended up in a fetal position holding her knees up to her chest.  (*See* Gallo Dep. 226; *see also* Pl.'s Gallo 56.1 ¶ 16; Defs.' Gallo 56.1 Resp. ¶ 16.)  Gallo's interaction with Officer Castagna is depicted in full in a video taken on a cell phone by a third-party witness.  (*See* Gallo Zelman Decl. Ex. 5.)

### 5.  Allegations Regarding Daniel Parker

At the time of the events in question, Plaintiff Daniel Parker was a member of the Pace University football team and played in the homecoming game on October 16, 2010.  (*See* Decl. of Bonita E. Zelman ("Parker Zelman Decl.") Ex. 1 ("Parker 50-h Testimony"), at 4, 7–9 (Dkt. No. 265, 11-CV-7264 Dkt.); *see also* Pl. Daniel Parker's Statement of Additional Disputed Facts

Pursuant to Local Rule 56.1(B) ("Pl.'s Parker 56.1") ¶ 1 (Dkt. No. 267, 11-CV-7264 Dkt.); County & Town Defs.' Resp. to Pl.'s Counter 56.1 Statement ("Defs.' Parker 56.1 Resp.") ¶ 1 (Dkt. No. 272, 11-CV-7264 Dkt.).) Like the other Plaintiffs, Parker was at Finnegan's after the game. (*See* Parker 50-h Testimony 6, 50–51; *see also* Pl.'s Parker 56.1 ¶ 1; Defs.' Parker 56.1 Resp. ¶ 1.) After the lights came on at Finnegan's and patrons were told to leave, (*see* Parker 50-h Testimony 52–53; Parker Zelman Decl. Ex. 2 ("Parker Dep."), at 423; *see also* Pl.'s Parker 56.1 ¶ 2; Defs.' Parker 56.1 Resp. ¶ 2), Parker heard multiple gunshots fired in rapid succession, (*see* Parker 50-h Testimony 58–60; Parker Dep. 426; *see also* Pl.'s Parker 56.1 ¶ 3; Defs.' Parker 56.1 Resp. ¶ 3). The bar owner came in, pushed Parker aside, and said that someone needed to call the police. (*See* Parker 50-h Testimony 60; Parker Dep. 428–29, 443; *see also* Pl.'s Parker 56.1 ¶ 3; Defs.' Parker 56.1 Resp. ¶ 3.)

Parker exited Finnegan's and looked to the right, where he saw Henry's car in the middle of the roadway. (*See* Parker 50-h Testimony 61; Parker Dep. 442, 489; *see also* Pl.'s Parker 56.1 ¶ 4; Defs.' Parker 56.1 Resp. ¶ 4.) Parker saw Henry getting handcuffed on the driver's side of his vehicle, (*see* Parker Dep. 443–45, 627–28; *see also* Pl.'s Parker 56.1 ¶ 5; Defs.' Parker 56.1 Resp. ¶ 5), and Parker began asking what Henry had done, (*see* Parker 50-h Testimony 67–68; Parker Dep. 444; *see also* Pl.'s Parker 56.1 ¶ 5; Defs.' Parker 56.1 Resp. ¶ 5). Parker also saw Hinds getting handcuffed. (*See* Parker Dep. 443; *see also* Pl.'s Parker 56.1 ¶ 5; Defs.' Parker 56.1 Resp. ¶ 5.) When Parker saw Hinds, he was laying on his side in handcuffs on the side of the curb. (*See* Parker 50-h Testimony 61; *see also* Pl.'s Parker 56.1 ¶ 6; Defs.' Parker 56.1 Resp. ¶ 6.) Parker walked toward Hinds, and when he was about five feet away, he asked Hinds whether he was all right. (*See* Parker 50-h Testimony 61; *see also* Pl.'s Parker 56.1 ¶ 6; Defs.' Parker 56.1 Resp. ¶ 6.) Hinds told Parker that Henry had been shot. (*See* Parker 50-h Testimony

61; *see also* Pl.'s Parker 56.1 ¶ 6; Defs.' Parker 56.1 Resp. ¶ 6.) At the same time, an officer standing on the other side of Hinds directed Parker and others standing near Hinds to get back. (*See* Parker Dep. 622–25; *see also* Defs.' Local Rule 56.1 Statement ("Defs.' Parker 56.1") ¶ 5 (Dkt. No. 257, 11-CV-7264 Dkt.).) The officer was holding a gun in his hands, but was not aiming it at Parker. (*See* Parker Dep. 624–25.) Parker complied and began to walk the other way, toward Finnegan's, asking out loud, "What happened? What happened?" (Parker Dep. 494, 625–26; *see also* Defs.' Parker 56.1 ¶ 5; Pl.'s Parker 56.1 ¶ 6; Defs.' Parker 56.1 Resp. ¶ 6.)[2]

As he was headed back to Finnegan's, Parker saw Henry's feet on the other side of Henry's vehicle and could see police officers standing over him. (*See* Parker Dep. 495–96.) As he walked toward Henry, a police officer approached Parker. (*See id.* at 503.) Parker asked the officer, "What happened?" to which the officer replied, "[g]et back." (*Id.*; *see also* Defs.' Parker 56.1 ¶ 6.) Parker again asked the officer, "What happened?" and told the officer that Henry was his teammate. (Parker Dep. 503.) The officer again told Parker to "[g]et back." (*Id.*) Parker took a step back and asked the officer what had happened to Henry, asking "What did he do?" (*Id.*; *see also* Defs.' Parker 56.1 ¶ 7.) The officer ordered Parker to "[g]et the fuck back." (Parker Dep. 503; *see also* Defs.' Parker 56.1 ¶ 7.) There is no indication that Parker moved back at this time, and instead he looked at the officer and said, "[t]hat's my teammate. What did he do?" (Parker Dep. 503; *see also* Defs.' Parker ¶ 8.) The officer pulled out a gun, pointed it

---

[2] Parker's Counter Statement pursuant to Local Rule 56.1 does not line up with Parker's testimony and omits certain information about Parker's movements about the parking lot. The Court assumes that this is unintentional error, as the errors and omissions do not affect the merits of the pending Motions and Parker has not objected to Defendants' characterization of Parker's movements and the sequence of his various encounters with police officers. The Court will therefore rely on the testimony provided by Parker.

toward Parker's rib, and said, "[g]et the fuck back, or you'll be next."  (Parker Dep. 503.)  Parker

backed up.  (*See id.*; *see also* Pl.'s Parker 56.1 ¶ 8; Defs.' Parker Resp. ¶ 8.)

At this time, Parker moved back in the direction of where Hinds was, but by that time,

Hinds was being taken away in a police car.  (*See* Parker Dep. 504; *see also* Pl.'s Parker 56.1 ¶ 9;

Defs.' Parker 56.1 Resp. ¶ 9.)  Parker next observed an officer with his gun raised yelling at

people to "[g]et back, [g]et back."  (Parker Dep. 505; *see also* Pl.'s Parker 56.1 ¶ 11; Defs.'

Parker 56.1 Resp. ¶ 11.)  Parker froze at first in shock, then backed up a little bit before another

student, Matt Spooner, led Parker away back toward Finnegan's.  (*See* Parker Dep. 505; *see also*

Pl.'s Parker 56.1 ¶¶ 11–12; Defs.' Parker 56.1 Resp. ¶¶ 11–12.)

At some point after heading in the direction of Finnegan's, Parker changed direction and

went back toward the area in which a police officer had told him to "[g]et back."  (*See* Parker

Dep. 520–21; *see also* Defs.' Parker 56.1 ¶ 11.)  Parker proceeded to walk into the fire lane to

get a better view of Henry and to check on his friend.  (*See* Parker Dep. 527.)  From where he

was standing on the sidewalk, Parker could see a female attempting to give Henry chest

compressions.  (*See id.*; *see also* Pl.'s Parker 56.1 ¶ 16; Defs.' Parker 56.1 Resp. ¶ 16.)  At this

time, Officer Bosan approached Parker, telling him to get out of there.  (*See* Parker Dep. 527.)

Parker asked Officer Bosan whether he could go help the woman, now known to be Laura

Sardilli, because he was CPR certified.  (*See id.* at 527–28; *see also* Pl.'s Parker 56.1 ¶ 18; Defs.'

Parker 56.1 Resp. ¶ 18.)  Parker also asked Officer Bosan to let him help Henry because he was

his friend, but Officer Bosan told Parker, "[g]et out of here.  Get the fuck out of here."  (Parker

Dep. 528; *see also* Pl.'s Parker 56.1 ¶ 21; Defs.' Parker 56.1 Resp. ¶ 21.)  Parker took a step

back, (*see* Parker Dep. 528; *see also* Pl.'s Parker 56.1 ¶ 21; Defs.' Parker 56.1 Resp. ¶ 21), after

which he again asked if he could help his friend, (*see* Parker Dep. 537; *see also* Pl.'s Parker 56.1

¶ 22; Defs.' Parker 56.1 Resp. ¶ 22).  Officer Bosan again told Parker, "[g]et the fuck back."

(Parker Dep. 538.)

At this time, Sardilli stopped giving compressions and let Henry's head drop to the side,

and Parker could see that his mouth was open and covered in blood.  (*See* Parker Dep. 538; *see*

*also* Pl.'s Parker 56.1 ¶ 22; Defs.' Parker 56.1 Resp. ¶ 22.)  Seeing Henry's face, Parker pointed

his left arm in the direction of Henry and told Officer Bosan, "[y]'all fucken killed him."  (Parker

Dep. 538–39, 541; *see also* Defs.' Parker 56.1 ¶ 15.)  Parker then told Officer Bosan to look, and

he took a step toward his left.  (*See* Parker Dep. 544; *see also* Defs.' Parker 56.1 ¶ 15.)[3]  Officer

Bosan told Parker to "[g]et the fuck back," to which Parker responded, "No.  Look.  You guys

fucking killed him."  (Parker Dep. 544–45; *see also* Defs.' Parker 56.1 ¶ 16.)  At this point,

Officer Bosan punched Parker on the right side of his face.  (*See* Parker Dep. 552–53, 639; *see*

*also* Pl.'s Parker 56.1 ¶ 24; Defs.' Parker 56.1 Resp. ¶ 24.)  Parker stumbled back a few steps and

asked Bosan, "What did I do?", after which Officer Bosan told him to shut up.  (*See* Parker Dep.

565–66; *see also* Pl.'s Parker 56.1 ¶ 24; Defs.' Parker 56.1 Resp. ¶ 24.)  Parker raised both of his

---

[3] Defendants object to this assertion on the ground that at the hearing conducted pursuant to N.Y. Gen. Mun. Law § 50-h, Parker testified that he took a step forward, that is, in the direction of where Henry was, and not merely to the side.  (*See* Defs.' Parker 56.1 Resp. ¶ 26.)  But the rule providing that a party may not create an issue of fact by submitting an affidavit in opposition to a motion for summary judgment that contradicts the affiant's previous deposition testimony does not necessarily apply in these circumstances.  The Second Circuit has recognized that part of the rationale for this rule is "that a deposition of a witness, subject to cross-examination, is generally more reliable than an affidavit submitted to oppose a summary judgment motion," and thus the issues that arise in the latter context are less salient in the former.  *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).  Because Defendants have offered no reason why this Court should credit the 50-h testimony over Parker's subsequent deposition testimony, and because doing so would run counter to the well-settled rule that the Court must "construe the evidence in the light most favorable to the [nonmovants], drawing all reasonable inferences and resolving all ambiguities in their favor," *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017) (internal quotation marks omitted), the Court will accept Parker's deposition testimony as true, even if it conflicts or is otherwise in tension with the 50-h testimony.

hands up with his palms displayed.  (*See* Parker Dep. 565; *see also* Pl.'s Parker 56.1 ¶ 24; Defs.' Parker 56.1 Resp. ¶ 24.)  Officer Bosan forcefully threw Parker's body against the wall.  (*See* Parker Dep. 549–55, 566–70; *see also* Pl.'s Parker 56.1 ¶ 24; Defs.' Parker 56.1 Resp. ¶ 24.) Parker heard Officer Bosan tell other police officers to "[c]uff his ass."  (Parker Dep. 566–67; *see also* Pl.'s Parker 56.1 ¶ 25; Defs.' Parker 56.1 Resp. ¶ 25.)  Officer Bosan twisted Parker's arm, tackled him to the ground, and landed on the right side of his back.  (*See* Parker 50-h Testimony 103; Parker Dep. 570; *see also* Pl.'s Parker 56.1 ¶ 25; Defs.' Parker 56.1 Resp. ¶ 25.) As he was being arrested, Parker could feel Officer Bosan and other officers hitting him, striking him in the face, stomping on him, kicking his legs, and punching the back of his head.  (*See* Parker 50-h Testimony 111–14, 121–22; Parker Dep. 649, 651–55; *see also* Pl.'s Parker 56.1 ¶¶ 28–29; Defs.' Parker 56.1 Resp. ¶¶ 28–29.)  Parker never resisted being handcuffed.  (*See* Parker 50-h Testimony 122; *see also* Pl.'s Parker 56.1 ¶ 30; Defs.' Parker 56.1 Resp. ¶ 30.)

The attack did not abate until Parker was lifted off the ground and taken to a police car. (*See* Parker Dep. 655; *see also* Pl.'s Parker 56.1 ¶ 32.)  When Officer Bosan brought Parker to the police vehicle, he opened the car door and pushed Parker into the police car.  (*See* Parker Dep. 595; *see also* Pl.'s Parker 56.1 ¶ 34; Defs.' Parker 56.1 Resp. ¶ 34.)  Parker landed in the back seat with his legs still outside the vehicle; Officer Bosan slammed the car door on Parker's legs.  (*See* Parker Dep. 595; *see also* Pl.'s Parker 56.1 ¶ 34; Defs.' Parker 56.1 Resp. ¶ 34.) Parker cried out in pain, and Officer Bosan told Parker to get his feet in the car, after which he kicked Parker's feet into the vehicle.  (*See* Parker Dep. 595; *see also* Pl.'s Parker 56.1 ¶ 34; Defs.' Parker 56.1 Resp. ¶ 34.)

Officer Bosan testified that he never saw Parker approach any police officers who were in the act of rendering medical aid to either Officer Hess or Henry.  (*See* Bosan Dep. 461; *see also*

Pl.'s Parker 56.1 ¶¶ 71–72; Defs.' Parker 56.1 Resp. ¶¶ 71–72.)  Officer Bosan filed a

Misdemeanor Information against Parker after his arrest, charging Parker with obstructing

governmental administration in the second degree.  (*See* Parker Zelman Decl. Ex. 4.)  He later

filed a superseding misdemeanor information on December 8, 2010, charging Parker with

resisting arrest, obstructing governmental administration in the second degree, and disorderly

conduct refusing to move on.  (*See* Parker Zelman Decl. Ex. 5.)  Like the charges against Garcia

and Delpeche, the charges against Parker were dismissed upon motion by the District Attorney's

Office.  (*See* Parker Zelman Decl. Ex. 7.)

### 6.  Allegations Regarding Joseph Romanick

Plaintiff Joseph Romanick was at Finnegan's on the evening of October 16, 2010.  (*See*

Decl. of Bonita E. Zelman ("Romanick Zelman Decl.") Ex. 2 ("Romanick Dep."), at 346–48

(Dkt. No. 254, 11-CV-7267 Dkt.); *see also* Defs.' Local Rule 56.1 Statement ("Defs.' Romanick

56.1") ¶ 1 (Dkt. No. 246, 11-CV-7267 Dkt.); Pl.'s Resp. to Defs.' Local Rule 56.1 Statement

("Pl.'s Romanick 56.1 Resp.") ¶ 1 (Dkt. No. 255, 11-CV-7267 Dkt.).)  When the lights came on

and patrons were instructed to leave, (*see* Romanick Dep. 347–48; *see also* Defs.' Romanick

56.1 ¶ 1; Pl.'s Romanick 56.1 Resp. ¶ 1), Romanick exited the bar, (*see* Romanick Dep. 348; *see

also* Defs.' Romanick 56.1 ¶ 3; Pl.'s Romanick 56.1 Resp. ¶ 3).  As he exited, something caught

Romanick's attention and he walked down the sidewalk to investigate.  (*See* Romanick Dep.

386–87; *see also* Defs.' Romanick 56.1 ¶ 3; Pl.'s Romanick 56.1 Resp. ¶ 3.)  As Romanick

approached an area of the shopping center with a Citibank and a bagel store, he noticed a crowd

of people who appeared to be upset.  (*See* Romanick Dep. 388; *see also* Defs.' Romanick 56.1

¶ 4; Pl.'s Romanick 56.1 Resp. ¶ 4.)  Romanick saw Hinds on the ground in handcuffs, and when

he asked Hinds what had happened, Hinds replied that he believed Henry had been shot.  (*See*

Romanick Dep. 389–90; *see also* Defs.' Romanick 56.1 ¶ 4; Pl.'s Romanick 56.1 Resp. ¶ 4.)  A police officer approached the scene and ordered everyone to get back, (*see* Romanick Dep. 393; *see also* Defs.' Romanick 56.1 ¶ 5; Pl.'s Romanick 56.1 Resp. ¶ 5), and Romanick complied, (*see* Romanick Dep. 393–94; *see also* Defs.' Romanick 56.1 ¶ 6; Pl.'s Romanick 56.1 Resp. ¶ 6).

After backing up onto the sidewalk and walking back toward Finnegan's, Romanick walked into the street to try and find out what had happened to Henry.  (*See* Romanick Dep. 397–98; *see also* Defs.' Romanick 56.1 ¶ 7; Pl.'s Romanick 56.1 Resp. ¶ 7.)  A friend of Romanick's, Mike Ligouri, approached Romanick and brought him back to the sidewalk, telling him they needed to get out of there.  (*See* Romanick Dep. 415–18; *see also* Defs.' Romanick 56.1 ¶ 8; Pl.'s Romanick 56.1 Resp. ¶ 8.)  Although Romanick complied with Ligouri's insistence that he step out of the roadway, he did not follow Ligouri out of the area and instead remained on the sidewalk.  (*See* Romanick Dep. 420–21.)  A police officer in a yellow jacket was nearby, and he directed Romanick to remain on the sidewalk.  (*See* Romanick Dep. 421–22; *see also* Defs.' Romanick 56.1 ¶ 8; Pl.'s Romanick 56.1 Resp. ¶ 8.)  Romanick disregarded that order and approached Henry after he saw a woman administering chest compressions to Henry. (*See* Romanick Dep. 424–26; *see also* Defs.' Romanick 56.1 ¶ 9; Pl.'s Romanick 56.1 Resp. ¶ 9.)

When Romanick returned to the sidewalk, he was approached by his friend Matt Arciero, who told Romanick they needed to leave.  (*See* Romanick Dep. 426; *see also* Defs.' Romanick 56.1 ¶ 10; Pl.'s Romanick 56.1 Resp. ¶ 10.)  Romanick was upset and did not want to leave, causing Arciero to place Romanick in a bear hug until he came to his senses.  (*See* Romanick Dep. 427; *see also* Defs.' Romanick 56.1 ¶ 10; Pl.'s Romanick 56.1 Resp. ¶ 10.)  The bear hug caused Romanick to move backward so that his back collided with the window of the bagel store, causing the window to break and collapse on top of him.  (*See* Romanick Dep. 427; *see*

*also* Defs.' Romanick 56.1 ¶ 11; Pl.'s Romanick 56.1 Resp. ¶ 11.)  After the window broke, several police officers approached Romanick and told him to "get the fuck down."  (Romanick Dep. 453–54; *see also* Defs.' Romanick 56.1 ¶ 12; Pl.'s Romanick 56.1 Resp. ¶ 12.)  Romanick moved forward, dropped to his knees, and put one arm behind his back—his other arm was in a sling.  (*See* Romanick Dep. 440–42, 821; *see also* Defs.' Romanick 56.1 ¶ 12; Pl.'s Romanick 56.1 Resp. ¶ 12.)  The officers tackled Romanick to the ground and cuffed his left hand before noticing the sling on his right hand, after which they cuffed his belt loop.  (*See* Romanick Dep. 442–43, 455–56; *see also* Defs.' Romanick 56.1 ¶ 13; Pl.'s Romanick 56.1 Resp. ¶ 13.)

Defendant Officer George Winsman testified that he was dispatched to the Thornwood Shopping Center on October 16, 2010 to respond to a shooting.  (*See* Romanick Zelman Decl. Ex. 10 ("Winsman Dep."), at 118–19; *see also* Defs.' Romanick 56.1 ¶ 19; Pl.'s Romanick 56.1 Resp. ¶ 19.)  When Officer Winsman arrived, the scene was chaotic and many individuals were screaming, crying, and running around.  (*See* Winsman Dep. 124; *see also* Defs.' Romanick 56.1 ¶ 19; Pl.'s Romanick 56.1 Resp. ¶ 19.)  Officer Winsman testified that he observed Romanick and another man who was trying to calm Romanick down next to the window of the bagel shop, and he then saw Romanick's arm move backward into the window and break the glass.  (*See* Winsman Dep. 175–78; *see also* Defs.' Romanick 56.1 ¶ 21; Pl.'s Romanick 56.1 Resp. ¶ 21.)  Officer Winsman further testified that it was he who arrested Romanick after the window of the bagel shop broke.  (*See* Winsman Dep. 25; *see also* Pl. Joseph Romanick's Statement of Additional Disputed Facts Pursuant to Local Rule 56.1(B) ("Pl.'s Romanick 56.1") ¶ 12 (Dkt. No. 256, 11-CV-7267 Dkt.); County & Town Defs.' Resp. to Pl.'s Counter 56.1 Statement ("Defs.' Romanick 56.1 Resp.") ¶ 12 (Dkt. No. 261, 11-CV-7267 Dkt.).)

Defendant Detective Marco Mendoza arrived at the scene after the bagel store window was broken and observed Romanick sitting in the back of a police vehicle; he was told that Romanick was responsible for breaking the window of the bagel store. (*See* Decl. of Drew W. Sumner ("Romanick Sumner Decl.") Ex. F ("Mendoza Dep."), at 113–15 (Dkt. No. 245, 11-CV-7267 Dkt.); *see also* Defs.' Romanick 56.1 ¶ 23; Pl.'s Romanick 56.1 Resp. ¶ 23.) Detective Mendoza interviewed Stephen Van Ostrand, the owner of Finnegan's, who provided the following statement:

> On Sunday, October 17, 2010, there was a major incident in the parking lot of the Thornwood Town Center. There was a lot of police officers on scene investigating. I two [sic] white males pushing and shoving each other. One of the males was wearing dark clothes. The other was wearing a white colored shirt and his arm was in a light colored sling. The guy with the white shirt was up against the large window of the old Bagel Works. His back was to the window. He was talking to someone looked [sic] like he was trying to calm him down. At one point he became upset and was yelling. The guy with the white shirt raised his hand in what looked like anger. He then pulled his hand back, causing his elbow to hit the window. The window shattered into pieces. An officer came over and arrested the guy for breaking the window. He was arrested right there where he was standing when the window broke.

(Mendoza Dep. 188–89; Romanick Zelman Decl. Ex. 6; *see also* Defs.' Romanick 56.1 ¶ 24; Pl.'s Romanick 56.1 Resp. ¶ 24.) The identification of an individual in a white shirt wearing a sling matched the description of Romanick. (*See* Defs.' Romanick 56.1 ¶ 24; Pl.'s Romanick 56.1 Resp. ¶ 24.)

Several other witnesses also provided statements. Arciero testified at his deposition that while he was trying to restrain Romanick, he "pushed him up against the window," and "the glass shattered from the top down, onto both of us, and cops charged at the both of us." (Romanick Zelman Decl. Ex. 3 ("Arciero Dep."), at 114–15; *see also* Pl.'s Romanick 56.1 ¶ 8; Defs.' Romanick 56.1 Resp. ¶ 8.) Arciero told the officers he worked for the bar, and the officers left him alone and instead grabbed Romanick "and threw him on the floor and

handcuffed him." (Arciero Dep. 114–15; *see also* Pl.'s Romanick 56.1 ¶ 8; Defs.' Romanick 56.1 Resp. ¶ 8.) Nonparty Andrew Kehrer gave a sworn statement to Investigator Saunders and Defendant Detective Greenberg in which he observed: "Bouncer picked up kid and shoved him into window of bagel store. Window broke but kid was able to avoid falling glass." (Romanick Zelman Decl. Ex. 8; *see also* Pl.'s Romanick 56.1 ¶ 9; Defs.' Romanick 56.1 Resp. ¶ 9.) Nonparty Ian Robert Coreth gave a sworn statement in which he stated that he "witnessed some guys yelling at each other. It appeared to be a bouncer, who then threw the other guy into the bagel store's window." (Romanick Zelman Decl. Ex. 9; *see also* Pl.'s Romanick 56.1 ¶ 10; Defs.' Romanick 56.1 Resp. ¶ 10.) Defendant Detective Matthew Brown also took statements from Van Ostrand and Officer Winsman. (*See* Romanick Sumner Decl. Ex. K, at 139–60; Mendoza Dep. 191.)

Detective Mendoza prepared a complaint charging Romanick with Criminal Mischief in the Third Degree based upon the statement of Van Ostrand. (*See* Romanick Zelman Decl. Ex. 11; *see also* Defs.' Romanick 56.1 ¶ 25; Pl.'s Romanick 56.1 Resp. ¶ 25.) Detective Greenberg thereafter filed a Superseding Misdemeanor Information against Romanick, charging him with two counts of Criminal Mischief in the Fourth Degree. (*See* Romanick Zelman Decl. Ex. 12; *see also* Pl.'s Romanick 56.1 ¶ 14; Defs.' Romanick 56.1 Resp. ¶ 14.) Like the other charges filed in these cases, the District Attorney's Office moved to dismiss the charges in the interest of justice, and the Town Court granted that application on the record. (*See* Romanick Zelman Decl. Exs. 4–5.)

### 7. Allegations Regarding Desmond Hinds

On the evening of October 16, 2010, Hinds was a patron at Finnegan's following the Pace homecoming game. (*See* Decl. of Bonita E. Zelman ("Hinds Zelman Decl.") Ex. 1 ("Hinds

Dep."), at 131 (Dkt. No. 282, 11-CV-7265 Dkt.); *see also* Defs.' Local Rule 56.1 Statement ("Westchester Hinds 56.1") ¶ 1 (Dkt. No. 265, 11-CV-7265 Dkt.); Pl.'s Resp. to Defs.' Local Rule 56.1 Statement ("Pl.'s Hinds 56.1 Westchester Resp.") ¶ 1 (Dkt. No. 287, 11-CV-7265 Dkt.).)  Upon exiting Finnegan's, Hinds walked over to where Henry and Cox were leaning against Henry's vehicle, and the three entered the vehicle together.  (*See* Hinds Dep. 149, 152; *see also* Westchester Hinds 56.1 ¶ 2; Pl.'s Hinds 56.1 Westchester Resp. ¶ 2.)  Henry was driving, Cox was in the front passenger seat, and Hinds sat in the rear driver's side seat before moving to the rear middle seat.  (*See* Hinds Dep. 185; *see also* Westchester Hinds 56.1 ¶ 2; Pl.'s Hinds 56.1 Westchester Resp. ¶ 2.)

As noted above, the facts surrounding the movement of Henry's vehicle and its interaction with Officer Hess are relayed in the Opinion & Order filed in the Cox case.  (*See* Cox Op. 4–12.)  Except where otherwise noted, the Court will not rehash those facts here, and will assume that the facts taken most favorably to Brandon Cox in that case should likewise be construed in Hinds's favor here.[4]  For the sake of clarity, the Court notes that Hess shot through the windshield of the vehicle a total of four times.  (*See* Cox Op. 10.)  One bullet struck Cox in the arm, and multiple bullets hit Henry.  (*See id.* at 11.)  Hinds was not struck by any bullets.

After Henry's vehicle came to a stop, Officer Castagna approached the driver's side door of the vehicle and called a dispatcher to send a medic and an ambulance to the scene.  (*See* Castagna Dep. 99, 105; *see also* Westchester Hinds 56.1 ¶ 8; Pl.'s Hinds 56.1 Westchester Resp. ¶ 8.)  Officer Jacobsen, meanwhile, approached the passenger side of the vehicle.  (*See* Jacobsen

---

[4] A review of Hinds's and Hess's respective 56.1 statements and supporting documents supports the conclusion that Hinds's account of the incident aligns with that of Cox's, and indeed, Hinds relies on many of the same deposition excerpts, reports, and documents relied on by Cox in his opposition to summary judgment.

Dep. 48; *see also* Westchester Hinds 56.1 ¶ 8; Pl.'s Hinds 56.1 Westchester Resp. ¶ 8.) Hinds was grabbed out of the vehicle and thrown to the ground by a police officer and his head hit the ground. (*See* Hinds Dep. 314–16, 470–71; *see also* Westchester Hinds 56.1 ¶ 9; Pl.'s Hinds 56.1 Westchester Resp. ¶ 9.) Hinds turned his head to look at the police officer over his right shoulder and stated, "Officer, we did absolutely nothing wrong." (Hinds Dep. 476; *see also* Westchester Hinds 56.1 ¶ 10; Pl.'s Hinds 56.1 Westchester Resp. ¶ 10.) The police officer told Hinds to "Shut the fuck up," and pointed his gun at Hinds's head. (*See* Hinds Dep. 476–77; *see also* Westchester Hinds 56.1 ¶ 11; Pl.'s Hinds 56.1 Westchester Resp. ¶ 11.) The officer then slammed Hinds's head into the ground for a second time. (*See* Hinds Dep. 478; *see also* Westchester Hinds 56.1 ¶ 12; Pl.'s Hinds 56.1 Westchester Resp. ¶ 12.) Officer Jacobsen thereafter handcuffed Hinds. (*See* Jacobsen Dep. 50–51; *see also* Westchester Hinds 56.1 ¶ 14; Pl.'s Hinds 56.1 Westchester Resp. ¶ 14.)

Hinds was later escorted to a police vehicle by Officer Jacobsen. (*See* Jacobsen Dep. 54; *see also* Westchester Hinds 56.1 ¶ 17; Pl.'s Hinds 56.1 Westchester Resp. ¶ 17.) Hinds was eventually taken to the Mount Pleasant Police Department. (*See* Hinds Dep. 384; *see also* Westchester Hinds 56.1 ¶ 18; Pl.'s Hinds 56.1 Westchester Resp. ¶ 18.) Hinds was released without charges being filed. (Westchester Hinds 56.1 ¶ 22; Pl.'s Hinds 56.1 Westchester Resp. ¶ 22.)

### 8. Additional Allegations

The Court notes that the above recitation of facts does not include every fact cited in the Parties' 56.1 statements. The omission of these facts is purposeful, as in the interest of brevity, the Court has omitted those facts that are either unnecessary background, immaterial to the disposition of these Motions, or relate to issues or claims that have been abandoned by Plaintiffs

in opposition to these Motions.  The omission of any fact above does not reflect a judgment about the materiality or relevance of a fact to any case as a whole.

B.  Procedural History

The Complaints in these cases were filed on October 14, 2011.  (*See* Dkt. No. 1, 11-CV-7258 Dkt.; Dkt. No. 1, 11-CV-7260 Dkt.; Dkt. No. 1, 11-CV-7261 Dkt.; Dkt. No. 1, 11-CV-7264 Dkt.; Dkt. No. 1, 11-CV-7265 Dkt.; Dkt. No. 1, 11-CV-7267 Dkt.)  A joint initial conference was held on November 7, 2011, after which the Parties were directed to file a proposed discovery schedule.  (*See, e.g.*, 11-CV-7258 Dkt. (minute entry for Nov. 7, 2011).)  A formal Order on November 29, 2011 consolidated the cases for the purposes of discovery, along with a case filed by Brandon Cox.  (*See, e.g.*, Order (Dkt. No. 7, 11-CV-7258 Dkt.).)  Because of endless squabbles, discovery was not completed until November 9, 2016.  (*See, e.g.*, 11-CV-7258 Dkt. (minute entry for Nov. 9, 2016).)  At that time, the Court entered a briefing schedule on Defendants' Motions for Summary Judgment.  (*See, e.g.*, Order (Dkt. No. 284, 11-CV-7258 Dkt.).)

Defendants filed their Motions for Summary Judgment and supporting papers on January 23, 2017.  (*See, e.g.*, Dkt. Nos. 291–94, 11-CV-7258 Dkt.)  Plaintiffs filed their opposition papers on April 17, 2017, (*see, e.g.*, Dkt. Nos. 302–05, 11-CV-7258 Dkt.), and Defendants filed their reply papers on May 18, 2017, (*see, e.g.*, Dkt. Nos. 308–09, 11-CV-7258 Dkt.).

Although Plaintiffs filed these claims naming numerous Defendants and alleging myriad claims, many of the claims have been eliminated either by way of stipulation or through abandonment at the summary judgment stage.  *See Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to

some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").  Specifically, only the following claims remain in each case:

- Garcia (11-CV-7258)
    - Federal and state false arrest claims against Officer Cusano and the County of Westchester;
    - Federal and state malicious prosecution claims against Officer Cusano and the County of Westchester;
    - State intentional infliction of emotional distress claims against Officer Cusano and the County of Westchester;
    - Federal excessive force and state assault and battery claims against Officer Cusano and the County of Westchester.

- Delpeche (11-CV-7260)
    - Federal and state false arrest claims against Officer Bosan and the County of Westchester;
    - Federal and state malicious prosecution claims against Officer Bosan and the County of Westchester;
    - State intentional infliction of emotional distress claims against Officer Bosan and the County of Westchester;
    - Federal excessive force and state assault and battery claims against Officer Bosan and the County of Westchester.

- LaRoche (11-CV-7261)
    - State assault claims against Officers Jacobsen and Castagna and the Town of Mount Pleasant.

- Gallo (11-CV-7262)
    - State assault claims against Officer Castagna and the Town of Mount Pleasant.

- Parker (11-CV-7264)
    - Federal and state false arrest claims against Officer Bosan and the County of Westchester;
    - Federal and state malicious prosecution claims against Officer Bosan and the County of Westchester;
    - State intentional infliction of emotional distress claims against Officer Bosan and the County of Westchester;
    - Federal excessive force and state assault and battery claims against Officer Bosan and the County of Westchester.

- Hinds (11-CV-7265)
    - Fourth Amendment unreasonable search and seizure claim against Officer Hess;

- State assault claims against Officer Hess and the Village of Pleasantville;
- State intentional infliction of emotional distress claims against Officer Hess, the Village of Pleasantville, Officer Jacobsen, and the Town of Mount Pleasant;
- Federal and state false arrest claims against Officer Jacobsen and the Town of Mount Pleasant;
- Federal excessive force and state assault and battery claims against Officer Jacobsen and the Town of Mount Pleasant.

- Romanick (11-CV-7267)
  - Federal and state false arrest against Officer Winsman and the County of Westchester;
  - Federal and state malicious prosecution claims against Officer Winsman and the County of Westchester;
  - Federal excessive force and state assault and battery claims against Officer Winsman and the County of Westchester.

The Court will endeavor to discuss similar claims together where possible.

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm.*

*Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks omitted)).

B.  Analysis

1.  Qualified Immunity

Because the issue of qualified immunity arises in several different contexts in these Motions, the Court will discuss the applicable law here and will apply it where necessary for each claim in dispute.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (internal quotation marks omitted). "[Qualified] immunity protects government's ability to perform its traditional functions . . . by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012) (alteration and internal quotation marks omitted). Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted). Summary judgment may be granted on the "basis of a qualified immunity defense premised on an assertion of objective reasonableness [if] the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (alteration and internal quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable law enforcement officer in the defendant's position would have believed his or her conduct would violate the asserted constitutional right. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). The Supreme Court has further instructed that "[t]o be clearly established, a right must be

sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (second alterations, citations, and internal quotation marks omitted). Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id.* at 665 (citations and internal quotation marks omitted). Otherwise stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

Although Defendants have not specifically invoked qualified immunity under New York state law, the Second Circuit has recognized both that New York law "does grant government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis," *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006), and that because of the similarities between the federal and New York doctrines of qualified immunity, if defendants would be "entitled to qualified immunity under federal law, summary judgment [is] similarly appropriate on . . . state law" claims, *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). Accordingly, to the extent any Defendant is qualifiedly immune under federal law, the same conclusion will hold for any analogous state law claims.

### 2. False Arrest

#### a. Applicable Law

"A [§] 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Id.* at 84. "The common law tort of false arrest is a species of false imprisonment," and under New York law, the elements of a false imprisonment claim are: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (alteration and internal quotation marks omitted).

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citation and internal quotation marks omitted). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (emphasis and internal quotation marks omitted).

#### b. Relevant Statutes

Across the Motions, Defendants invoke two statutes for which they contend officers had probable cause to arrest some of Plaintiffs: N.Y. Penal Law §§ 195.05 and 240.20. (*See, e.g.*, Mem. of Law in Supp. of the Town of Mount Pleasant & County of Westchester Defs.' Mot. for Partial Summ. J. ("Defs.' Garcia Mem.") 4–6 (Dkt. No. 292, 11-CV-7258 Dkt.).)

N.Y. Penal Law § 195.05 provides:

> A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act, or by means of interfering, whether or not physical force is involved, with radio, telephone, television or other telecommunications systems owned or operated by the state, or a county, city, town, village, fire district or emergency medical service or by means of releasing a dangerous animal under circumstances evincing the actor's intent that the animal obstruct governmental administration.

The elements of an offense under § 195.05 are "1) intent; 2) obstruction or impairment of a government function, or preventing or attempting to prevent the performance of that function by 3) physical interference." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 210 (E.D.N.Y. 2005). "[P]urely verbal interference may not satisfy the physical component under Penal Law § 195.05," instead, "the interference must be physical in nature at least in part." *Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 265 (E.D.N.Y. 2014) (citation and internal quotation marks omitted). "Activities such as refusing to obey orders, physically resisting arrest, interfering with the arrest of another, or assaulting a police officer are all typical acts that are properly charged as obstructing governmental administration." *People v. Beam*, 866 N.Y.S.2d 564, 567 (N.Y. Crim. Ct. 2008) (citations omitted).

N.Y. Penal Law § 240.20 provides:

> A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:
>
> 1. He engages in fighting or in violent, tumultuous or threatening behavior; or
>
> . . . .
>
> 6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse . . . .
>
> . . . .

Disorderly conduct is a violation.

There are three elements to a charge of disorderly conduct: "(i) the defendant's conduct must be 'public' in nature, (ii) it must be done with 'intent to cause public inconvenience, annoyance or alarm' or with recklessness as to 'a risk thereof,' and (iii) it must match at least one of the descriptions set forth in the statute." *Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001).

### c. Application

#### i. Garcia

Defendants argue that Officer Cusano had probable cause to arrest Garcia pursuant to N.Y. Penal Law §§ 195.05 and 240.20(6), or that Officer Cusano is entitled to qualified immunity because he had arguable probable cause to arrest. (*See* Defs.' Garcia Mem. 4–7.) In support of their argument under N.Y. Penal Law § 195.05, Defendants contend that because Garcia admitted that he "positioned himself so that he was in between Delpeche and the officers in order to 'protect' Delpeche," there was arguably probable cause for Officer Cusano to believe that Garcia had unlawfully interfered with the performance of an official governmental function. (*Id.* at 5 (citing Garcia Dep. 236–42).) But as Garcia points out, (*see* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. ("Pl.'s Garcia Opp'n") 11–14 (Dkt. No. 305, 11-CV-7258 Dkt.)), and as noted above, *see supra* note 1, there is a dispute as to whether Garcia stepped between Officer Cusano and Delpeche, and even if Garcia's testimony should be accepted as true (that is, that he did step between Officer Cusano and Delpeche), it is the information available to Officer Cusano, the arresting officer, that is relevant to the issue of probable cause, *see Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) ("Probable cause to arrest exists when the *arresting officer* has knowledge or reasonably trustworthy information of facts and circumstances that are

sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." (emphasis added)). Officer Cusano admitted that he never saw Garcia step between Officer Bosan and Delpeche, (*see* Cusano Dep. 126), thus making the question of whether Garcia actually did step in between the two moot for purposes of probable cause. The testimony suggesting that Garcia stepped in front of Delpeche therefore cannot form the basis for probable cause.

As Defendants point out, (*see* Reply Mem. of Law in Supp. of the Mount Pleasant & Westchester Defs.' Mot. for Partial Summ. J. 3–4 (Dkt. No. 308, 11-CV-7258 Dkt.)), the physical interference element of § 195.05 "need not be satisfied by the use of physical force, but can be met instead by the physical encroachment on police officers' work or by the performance of threatening and distracting movements near officers," *Hilderbrandt v. City of New York*, No. 13-CV-1955, 2014 WL 4536736, at *4 (E.D.N.Y. Sept. 11, 2014). But while the evidence taken in the light most favorable to Garcia indicates that Garcia walked into the area where Officer Bosan was attempting to apprehend Delpeche and came within two feet of Delpeche, Officer Cusano testified that Garcia never got "right next to [Delpeche]," that he did not "try to pull [Delpeche]" back, that he did not "know what [Garcia] was attempting to do," and that "[a]ll [he] saw was [Garcia] approach the—to come at the—the area between Officer Bosan and Mr. Delpeche rather quickly, and [he]—that's when [he] stepped in." (Cusano Dep. 126–27.) In none of the cases cited by Defendants did the evidence show only that the arrestee approached the area in which an arrest was being made. *See, e.g.*, *Decker v. Campus*, 981 F. Supp. 851, 858 (S.D.N.Y. 1997) (holding there was probable cause where the plaintiff "failed to comply with a deputy sheriff's instructions to 'step back' from the scene of an accident, and physically broke away from the sheriff, . . . [and the plaintiff] approached a rescue worker, touched his arm, and

asked him questions"); *People v. Tarver*, 591 N.Y.S.2d 907, 907 (App. Div. 1992) (holding that the evidence of obstructing governmental administration was sufficient to convict where the "defendant approached [an arresting officer] from behind in a threatening manner, cocking his arm as if to strike [the officer]").[5]

The most analogous case cited by Defendants is *Husbands ex rel. Forde v. City of New York*, No. 05-CV-9252, 2007 WL 2454106 (S.D.N.Y. Aug. 16, 2007), where the court held that probable cause existed to arrest where police officers were apprehending a suspect on the ground who was suspected of carrying a weapon and the plaintiff stepped toward the officers. *Id.* at *13. The court reasoned that "the officers needed to be entirely focused on the effectuation of [the suspect's] arrest," and that "it follow[ed] that any disturbance of the officers—by attempting to speak to [the suspect], and by taking a step toward the officers—may be viewed as sufficient interference." *Id.* Here, however, the evidence shows only that Garcia was approaching the area where Delpeche was being arrested, and not that the officers considered Delpeche (or Garcia) to be of any specific threat outside of being a general disturbance. In light of these circumstances, it is not clear whether probable cause existed to arrest Garcia.

Nevertheless, the Court finds that under these facts, Officer Cusano had at least arguable probable cause to arrest, and thus is entitled to qualified immunity. "In determining whether an officer is entitled to qualified immunity for a false arrest claim in the absence of probable cause, [the Court] examine[s] whether there was 'arguable probable cause.'" *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (quoting *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007)).

---

[5] Defendants cite also *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325 (E.D.N.Y. 2006), but that case is inapposite as there, the court held that "[p]robable cause existed . . . to support [the] plaintiff's arrest and detention because she was eventually convicted of several of the crimes for which she was arrested, and those convictions were upheld on appeal." *Id.* at 335.

"Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (internal quotation marks omitted). The Court must consider "the information possessed by the officer at the time of the arrest," but not "the subjective intent, motives, or beliefs of the officer." *Id.* (internal quotation marks omitted).

Here, the Court is not prepared to say that it was objectively reasonable for Officer Cusano to believe that probable cause existed. The evidence does suggest, however, that officers of reasonable competence could disagree on whether probable cause existed. As noted above, the circumstances in *Husbands* were similar, albeit not identical, to those here. And other cases make clear that approaching a police officer effecting an arrest can, in some circumstances, give rise to probable cause under § 195.05. *See, e.g.*, *In re Joshua C.*, 735 N.Y.S.2d 324, 325 (App. Div. 2001) (holding that the evidence would have been sufficient to convict a juvenile of obstructing governmental administration where the juvenile ignored directions of officers to leave the scene of a domestic dispute and "was then arrested when he approached a deputy who was trying to restrain [the juvenile's] brother"); *People v. Romeo*, 779 N.Y.S.2d 860, 862 (App. Div. 2004) (holding that the evidence of obstructing governmental administration was sufficient to convict where the officers were "attempting to subdue and transfer an arrested person from one police vehicle to another" and the "defendant repeatedly ignored orders that he remove himself from the situation"). Moreover, at least one federal court has found probable cause in similar circumstances, *see Petway v. City of New York*, No. 12-CV-279, 2014 WL 839931, at *2, *5–7 (E.D.N.Y. Mar. 4, 2014) (holding there was probable cause where the plaintiff came within three or four feet of an arrest taking place near a crowd of approximately 20 people and he picked up a pen that the arrestee spat out of her mouth), and another federal court has granted

qualified immunity in similar circumstances, *see Antic v. City of New York*, No. 16-CV-2425, 2017 WL 3208588, at *2–4 (S.D.N.Y. July 27, 2017) (holding an officer was entitled to qualified immunity where the plaintiff tapped the shoulder of an officer standing a few feet from where an arrest was taking place), *appeal filed*, No. 17-2670 (2d Cir. Aug. 25, 2017). These cases rest on the broad principle that "merely approaching the police, or speaking during the course of a police action, or disregarding police instructions, will support a conviction for [obstructing governmental administration]." *Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 403 (E.D.N.Y. 2011).[6]

In these circumstances, it cannot be said that reasonable officers could not disagree on whether Officer Cusano had probable cause to arrest Garcia. Officer Cusano was at the scene of a shooting, where a vehicle had struck an officer and two individuals had been shot. Regardless of which party was at fault the circumstances were not such that a reasonable officer, presumably aware of the case law cited above, could not have concluded that Garcia's approach to an area in which officers were confronting Delpeche and effecting an arrest following a shooting was an unlawful interference with a governmental function.

Garcia additionally contends that Officer Cusano could not have had probable cause because he testified "that he did not know whether [Garcia's] intent was to interfere with or interrupt any governmental administration." (Pl.'s Garcia Opp'n 13 (citing Cusano Dep. 105).)

---

[6] In *Hilderbrandt*, the court noted that this statement from *Rasmussen* was "pure dicta" and was "unsupported by the three cases it cites." *Hilderbrandt*, 2014 WL 4536736, at *6. The Court agrees that the cited statement from *Rasmussen* is a broad generalization of the law, but it is nevertheless useful in illustrating the low bar that courts have imposed for finding arguable probable cause in this context. *See Antic*, 2017 WL 3208588, at *4 (noting that whether *Rasmussen* and other cases in broadly applying § 195.05, were "right or wrong," they "compel the conclusion that officers of reasonable competence could disagree on whether the probable cause test was met").

But the Second Circuit has instructed that "because the practical restraints on police in the field are greater with respect to ascertaining intent, the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great." *Zalaski v. City of Hartford*, 723 F.3d 382, 393 (2d Cir. 2013) (alteration and internal quotation marks omitted). While Officer Cusano surely could not have *known* what Garcia's intent was, (*see* Cusano Dep. 105), he was permitted to assess the "totality of the circumstances" and make a conclusion based on circumstantial evidence as to whether he had probable cause to believe that Garcia's intent was to interfere with the arrest, *Zalaski*, 723 F.3d at 393. Moreover, "probable cause depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest," and "the probable cause inquiry is objective rather than subjective." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (internal quotation marks omitted). The Court is thus not concerned with Officer Cusano's state-of-mind at the time of the arrest, but only with what inferences a reasonable officer could draw from the facts available. Here, there is no evidence suggesting that Garcia's movement toward Delpeche was not purposeful, or that any reasonable officer would perceive it to be so. Garcia's argument to the contrary is no reason to deny qualified immunity to Officer Cusano.

Accordingly, the false arrest claims against Officer Cusano are dismissed on the ground of qualified immunity.[7]

### ii. Delpeche

Defendants argue that Officer Bosan had probable cause to arrest Delpeche pursuant to N.Y. Penal Law §§ 195.05 and 240.20(6), or that Officer Bosan also is entitled to qualified

---

[7] The Court will not examine here whether some other criminal statute may have provided a basis for the arrest.

immunity because he had arguable probable cause to arrest. (*See* Mem. of Law in Supp. of the Town of Mount Pleasant & County of Westchester Defs.' Mot. for Partial Summ. J. ("Defs.' Delpeche Mem.") 7–12 (Dkt. No 245, 11-CV-7260 Dkt.).) Defendants specifically point out that Delpeche was told to "back the fuck up" the first time he approached Henry's vehicle, and although Delpeche initially complied, he subsequently disregarded the officer's instructions and approached an officer who was standing in the direction of the Henry vehicle. (*See id.* at 8 (citing Delpeche Dep. 140, 165–66, 173, 186–87).)

The problem with Defendants' argument here is that it construes the facts in the light most favorable to Defendants instead of Delpeche. Although Delpeche testified that after Fasano let him go, he moved "a couple of feet" toward another officer, (*see* Delpeche Dep. 186), he subsequently clarified that he moved laterally along the sidewalk, and did not take any steps off the sidewalk toward the officer or Henry's vehicle, (*see id.* at 188–89). Similarly, although Delpeche admitted that he moved a little closer to Henry's vehicle after Fasano let him go, (*see id.* at 187), he did not leave the sidewalk, (*see id.* at 186). In light of this testimony, construed in the light most favorable to Delpeche, there is no evidence that Delpeche made any overt movements toward the Henry vehicle after being told to "get the fuck back," or that he stepped off the sidewalk. The record construed in favor of Delpeche, instead, reflects only that Delpeche moved "[m]aybe a couple of feet" along the sidewalk, hardly enough for an officer to conclude that Delpeche had defied the order of the officers to stay away from Henry's vehicle or that he was attempting to interfere with police activity.

Defendants also point to the limited video footage as evidence that Delpeche's testimony must be rejected. (*See* Defs.' Delpeche Mem. 8–9.) But while Defendants are correct that a court may disregard testimony by a party that is "utterly discredited" by video footage, *Scott v.*

*Harris*, 550 U.S. 372, 380–81 (2007), no such circumstances are present here.  The footage taken from the dashcam of Officer Cusano gives little information about the interactions between Delpeche and the officers, as it is not even clear whether Delpeche is the individual depicted in the footage and, in any event, most of the interaction is either obscured by other vehicles or is out of frame.  (*See* Delpeche Zelman Decl. Ex. 4.)  The same is true of the Citibank surveillance footage, where almost the entire interaction is similarly out of frame, out of focus, or obscured. (*See* Decl. of Drew W. Sumner ("Sumner Delpeche Decl.") Ex. G (Dkt. No. 247, 11-CV-7260 Dkt.).)  What is shown in the Citibank footage sheds equally little light on the events in question. (*See id.*)  Likewise, the cell-phone footage taken by a third party, while much closer to the action, does not depict enough of the interaction to determine with any certainty what was said, how many times Delpeche might have disobeyed orders, or whether he was doing anything other than standing on the sidewalk.  (*See* Gallo Zelman Decl. Ex. 5.)

Equally fruitless is Defendants' invocation of Officer Bosan's testimony that he saw Delpeche numerous times "on the sidewalk, in the street, in the roadway, by the car, up onto the sidewalk," and that Delpeche was "told numerous times to move on."  (Bosan Dep. 226, 271.) Even assuming such broad and vague testimony, unsupported by specific facts, could serve as the basis for a grant of summary judgment, the Court must accept Delpeche's version of the events, which does not involve "numerous" interactions with police officers who told him to move back, but rather only one instance in which he was told to step back (after which he did step back) and one instance in which, after moving a couple of feet along the sidewalk, he was approached by an officer with a weapon drawn, yelled at, and Tased.  Nor may Defendants rely on the testimony of third-party witness Robert Coulombe, who took the cell-phone footage provided in this case.  Coulombe testified only that he believed Delpeche was the individual in

the cell-phone footage near the Henry vehicle. (*See* Sumner Delpeche Decl. Ex. I, at 229.) But Delpeche has never disputed that, at one point, he tried to approach Henry's vehicle, but was turned away by an officer. (*See* Delpeche Dep. 141–42, 570; *see also* Pl.'s Delpeche 56.1 ¶ 4; Defs.' Delpeche 56.1 Resp. ¶ 4.) Coulombe's testimony, even if accepted as true, does not advance Defendants' case.

Under N.Y. Penal Law § 195.05, "[f]ailing to obey a police order, in itself, will not satisfy the requirement of the statute." *Hilderbrandt*, 2014 WL 4536736, at *4; *see also Dowling v. City of New York*, No. 11-CV-4954, 2013 WL 5502867, at *4 (E.D.N.Y. Sept. 30, 2013) ("Failing to obey a police order, in and of itself, does not constitute a circumstance that gives rise to probable cause for an arrest for obstructing government administration."). Instead, such disobedience must either "create[] some other hazard or interference," or must be "combined with another unlawful act." *Dowling*, 2013 WL 5502867, at *4. Because the record indicates only that, at most, Delpeche disobeyed a police order in the most technical sense by moving marginally closer, and only laterally, to Henry's vehicle, there is no probable cause for an arrest pursuant to this statute.

With respect to N.Y. Penal Law § 240.20(1), Defendants' argument again rests on the contention that Delpeche was "ordered to leave the area surrounding the Henry vehicle and where Desmond Hinds lay on the ground in handcuffs," and that he "disregarded those orders and approached the area multiple times." (Defs.' Delpeche Mem. 8.) But these contentions overstate the record, which indicates that Delpeche was told to back away only once and that he complied with that order. Defendants also claim that "[a]fter being told to back up, [Delpeche] repeatedly asked questions of the officer, to which the officer responded 'shut the fuck up.'" (*See* Reply Mem. of Law in Supp. of the Mount Pleasant & Westchester Defs.' Mot. for Partial

Summ. J. 2 (Dkt. No. 263, 11-CV-7260 Dkt.).)  But Delpeche never testified that the second officer, the one who approached Delpeche with his gun drawn after Fasano let him go, ever told him to back up, and Defendants' citations to the record do not support their contention otherwise. (*See* Delpeche Dep. 173, 187, 190–91, 552.)

In any event, as Delpeche points out, (*see* Pl.'s Opp'n to Defs.' Mot. for Partial Summ. J. ("Pl.'s Delpeche Opp'n") 13 (Dkt. No. 257, 11-CV-7260 Dkt.)), Delpeche was not congregating with others when he was interacting with Officer Bosan.  As the Second Circuit has recently recognized, New York courts have held that in order to meet the requirement in § 240.20(6) that the suspect be "congregating with other persons in a public place," the gathering must include "at the very least three persons at a given time and place, including the individual who was arrested."  *Kass v. City of New York*, 864 F.3d 200, 211 (2d Cir. 2017) (alterations and internal quotation marks omitted); *see also Carrillos v. Incorporated Village of Hempstead*, 87 F. Supp. 3d 357, 378 (E.D.N.Y. 2015) (denying motion for summary judgment where the plaintiff testified that "at the time the police arrived, she was only with her boyfriend," and there was thus an issue of fact with respect to "whether [the] plaintiff was congregating with others").  While there were other individuals outside of Finnegan's, there is no indication that Delpeche was congregating with two or more other individuals and was told to disperse.  In the absence of such evidence, there was no probable cause to arrest Delpeche pursuant to N.Y. Penal Law § 240.20(6).

The facts at trial may very well discredit Delpeche's account, and a jury may conclude from Officer Bosan's testimony and the video footage that Delpeche ignored numerous orders to move back, or that he was "belligerent, uncooperative and refused a direct request that he . . . leave the area" such that it may be said that he was interfering with a governmental function.

*People v. Baltes*, 904 N.Y.S.2d 554, 557 (App. Div. 2010). But construing the facts in the light most favorable to Delpeche, the Court cannot say with legal certainty that Officer Bosan had probable cause to arrest Delpeche.

Regarding qualified immunity, where, as here, "there are facts in dispute that are material to a determination of reasonableness, summary judgment on qualified immunity grounds is not appropriate." *McKelvie v. Cooper*, 190 F.3d 58, 63 (2d Cir. 1999). Thus, because the material facts regarding the circumstances of Delpeche's interactions with Officer Bosan and the other officers at the scene are in dispute, qualified immunity is not appropriate for the same reasons discussed above. *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (holding that "[i]f there is no dispute as to the material historical facts, the matter of whether the officer's conduct was objectively reasonable is an issue of law to be determined by the court," but "if there is such a dispute, . . . the factual questions must be resolved by the factfinder" (alteration and internal quotation marks omitted)); *see also Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 459 (S.D.N.Y. 2012) ("Here, there are material factual disputes, including the inferences that arise from the facts, relating to the legality of the entry into [the plaintiff's] apartment her arrest, precluding resolution of the qualified immunity defense on summary judgment.").[8] Accordingly, Defendants' Motion is denied with respect to Delpeche's false arrest claim.

### iii. Parker

As with other Plaintiffs, Defendants argue that Officer Bosan had probable cause to arrest Parker based on potential violations of N.Y. Penal Law §§ 195.05 and 240.20(6), or that he is qualifiedly immune from suit. (*See* Mem. of Law in Supp. of the Town of Mount Pleasant &

---

[8] There is no question that "the right not to be arrested without probable cause is clearly established." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000).

County of Westchester Defs.' Mot. for Partial Summ. J. ("Defs.' Parker Mem.") 8–11 (Dkt. No. 255, 11-CV-7264 Dkt.).)

For the same reasons discussed above with respect to Delpeche, there was no probable cause to arrest Parker for a violation of N.Y. Penal Law § 240.20(6), as that statute requires the suspect to be "congregat[ing] with other persons in a public place," and there is no indication that Parker congregated with any other individuals at the scene or that he was ordered to cease such congregation.

With respect to N.Y. Penal Law § 195.05, however, the question is a closer one. Defendants point to the fact that Parker "repeatedly failed to comply with officers' directives to step away from the scene," and contend that the fact Parker "may have been upset over the injuries resulting to his teammate and that he intended to render medical aid does not negate the fact that Defendants had probable cause to arrest" him. (Defs.' Parker Mem. 10.) But as Parker points out, (*see* Pl.'s Opp'n to Defs.' Mot. for Partial Summ. J. ("Pl.'s Parker Opp'n") 16 (Dkt. No. 268, 11-CV-7264 Dkt.)), and as discussed above, the mere failure to obey a police order does not, absent other circumstances, give rise to probable cause for an arrest pursuant to N.Y. Penal Law § 195.05, *see Hilderbrandt*, 2014 WL 4536736, at *4. Defendants argue in their reply brief that the evidence shows not only that Parker disregarded Officer Bosan's instructions, but also that he "made contact with [Officer Bosan] and tried to walk past him." (*See* Reply Mem. of Law in Supp. of the Mount Pleasant & Westchester Defs.' Mot. for Partial Summ. J. 3 (Dkt. No. 271, 11-CV-2764).) But while Officer Bosan did testify that Parker physically pushed him in an effort to get closer to the crime scene, (*see* Bosan Dep. 454–55), no such undisputed fact appears in Defendants' 56.1 statement, (*see generally* Defs.' Parker 56.1), and given that

Parker's testimony omits any mention of a physical confrontation with Officer Bosan prior to his arrest, the Court assumes Parker would have disputed such an allegation if given the chance.

The facts construed in the light most favorable to Parker, instead, show that although Parker walked to different areas around the crime scene, he complied with orders to get back in all but one instance. (*See* Parker Dep. 503, 505, 527–28, 537–38, 544–45, 622–25; *see also* Defs.' Parker 56.1 ¶¶ 5–8, 16; Defs.' Parker 56.1 Resp. ¶¶ 11–12, 21–22.) In the one instance in which he did not move back, there is no evidence or allegation that he was preventing Officer Bosan from performing any official duty. Unlike Garcia, for instance, who approached Officer Bosan as he was arresting Delpeche, there is no indication that in this instance, Officer Bosan was performing any activity other than ordering Parker to step back. Again, the cases cited by Defendants (which are the same cases cited in their Motion papers against Garcia) are inapposite. In *Husbands*, the sister of a suspect was stepping forward while the police were attempting to arrest the suspect, whom the police feared was carrying a weapon. *See* 2007 WL 2454106, at *2. Here, there was no arrest in progress, no weapon, and no evidence suggesting that Parker was moving *toward* Officer Bosan, Henry, or the rest of the crime scene when he was arrested. (*See* Parker Dep. 544–49.) In *Decker*, the plaintiff did not just refuse to comply with a deputy sheriff's instructions to take a step back, he physically broke away from the sheriff and approached a rescue worker, touching his arm and asking him questions while the worker tried to save the plaintiff's wife's life. *See* 981 F. Supp. at 858. The court held that there was probable cause to arrest the plaintiff under N.Y. Penal Law § 195.05 because the plaintiff's actions "obstructed the duties of two government officials and risked delaying the rescue of his wife." *Id.* Here, while Henry and Officer Hess were both in need of and received some medical attention, there is no evidence that Parker interfered with the administration of care to either

individual. (*See* Bosan Dep. 461 (Officer Bosan testifying that he never saw Parker approach an officer who was rendering aid to either Henry or Hess)) Even further afield is *Tarver*, in which the suspect approached a police officer from behind in a threatening manner and diverted the arresting officer's attention. *See* 591 N.Y.S.2d at 907. Plainly, no such circumstances were present here.

In light of the factual disputes that pervade the circumstances of Parker's arrest, there is no basis upon which the Court may conclude at this stage that Officer Bosan had probable cause to arrest Parker. Under Parker's version of events, although he did not comply with Officer Bosan's final direction to take a step back, he did not impede any officer's execution of his or her governmental duties. Such circumstances do not rise to the level of a violation under N.Y. Penal Law § 195.05.

For the same reasons, the Court cannot conclude at this stage that Officer Bosan is entitled to qualified immunity. *See Zellner*, 494 F.3d at 368; *Tsesarskaya*, 843 F. Supp. 2d at 459. Accordingly, Defendants' Motion for Summary Judgment is denied with respect to Parker's false arrest claims.

### iv. Romanick

Finally, Defendants move for summary judgment with respect to Romanick's claims for false arrest, arguing that Officer Winsman had probable cause to arrest Romanick for criminal mischief and disorderly conduct. (*See* Mem. of Law in Supp. of the Town of Mount Pleasant & County of Westchester Defs.' Mot. for Partial Summ. J. ("Defs.' Romanick Mem.") 7–8 (Dkt. No. 244, 11-CV-7267 Dkt.).) Defendants are correct on this point.

Criminal mischief in the fourth degree is defined by N.Y. Penal Law § 145.00, which provides:

A person is guilty of criminal mischief in the fourth degree when, having no right to do so nor any reasonable ground to believe that he or she has such right, he or she:

. . . .

3. Recklessly damages property of another person in an amount exceeding two hundred fifty dollars . . . .

Officer Winsman testified that he saw an individual trying to calm Romanick down, and that at some point, Romanick's arm moved backward and struck the glass of the bagel shop, breaking the window. (*See* Winsman Dep. 176–78.) This account is largely corroborated by Romanick, who testified that the window broke when Arciero tried to restrain him and caused Romanick to back into the window of the bagel shop. (*See* Romanick Dep. 427.) The sole distinction between these stories—whether it was Romanick's arm or his back that caused the window to break—has no bearing on the simple fact that Officer Winsman observed two individuals in a physical confrontation move backward and break the glass window of a bagel store.

Romanick argues that probable cause is lacking here because the testimony of Romanick, Arciero, Kehrer, and Coreth all vindicate Romanick and show that he was pushed into the window by Arciero, and therefore did not intentionally or recklessly break the window. (*See* Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. 9–10 (Dkt. No. 257, 11-CV-7267 Dkt.).) Romanick's argument here misses the mark. There may very well be evidence from other witnesses that, if credited by a jury, would exonerate Romanick from any culpable conduct, but that is beside the point here. First, as Defendants point out, the statements of Coreth and Kehrer were not even provided until more than two weeks after Romanick was arrested. (*See* Reply Mem. of Law in Supp. of the Town of Mount Pleasant & County of Westchester Defs.' Mot. for Partial Summ. J. 1–2 (Dkt. No. 260, 11-CV-7267 Dkt.).) And the statements of Romanick and Arciero, whenever they were or could have been obtained, were surely not taken

53

before Officer Winsman ran over to effect the arrest. When assessing probable cause, "courts must consider those facts *available to the officer* at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks omitted). Whatever information Officer Winsman could have or did obtain *after* the arrest is simply not relevant.

Second, while "officer[s] may not disregard plainly exculpatory evidence," *id.*, "after they obtain sufficient evidence to establish the existence of probable cause, police are not obligated to attempt to disprove the existence of any evidence weighing against a finding that the suspect committed a given crime," *Drummond v. Castro*, 522 F. Supp. 2d 667, 675–76 (S.D.N.Y. 2007); *see also Carson v. Lewis*, 35 F. Supp. 2d 250, 261 (E.D.N.Y. 1999) ("[O]nce probable cause is established the police do not have to endeavor to negate it."). Upon turning around and seeing Romanick's body move into the window and shatter the glass, Officer Winsman was not obliged to take witness statements and corroborate stories before making an arrest. And even if he had done so, both Officer Winsman's and Van Ostrand's perspective pointed to Romanick as the guilty party, and "a police officer may cho[o]se to rely on either of two conflicting sworn statements in determining probable cause." *Christman v. Kick*, 342 F. Supp. 2d 82, 88 (D. Conn. 2004); *see also Creighton v. City of New York*, No. 12-CV-7454, 2017 WL 636415, at *27 (S.D.N.Y. Feb. 14, 2017) ("[T]he existence of . . . conflicting evidence does not vitiate the probable cause established by an eyewitness identification."). Officer Winsman witnessed conduct that could reasonably be said to fall under the purview of N.Y. Penal Law § 145.00(3), and the fact that Romanick continues to insist his innocence now, with all of the subsequent testimony at his disposal, does not vitiate the probable cause Officer Winsman acted on at the time of the arrest.

Accordingly, because Officer Winsman had probable cause to believe Romanick had violated N.Y. Penal Law § 145.00(3), Defendants' Motion is granted with respect to Romanick's claims for false arrest.[9]

### 3. Fourth Amendment Search and Seizure

Officer Hess has moved for summary judgment with respect to Hinds's claim under the Fourth Amendment that Officer Hess illegally seized him within the meaning of the Fourth Amendment when he ran into the roadway and fired into Henry's vehicle. (*See* Mem. of Law in Supp. of Def. Aaron Hess' Mot. for Summ. J. ("Hess Hinds Mem.") 13 (Dkt. No. 260, 11-CV-7265 Dkt.).) This same claim was discussed at length in a prior Opinion & Order rendered in Cox's suit against Officer Hess and others. (*See* Cox Op. 17–28.) The only difference between Cox and Hinds is that Cox was struck by one of Officer Hess's bullets, whereas Hinds was not, but such a difference is not material for purposes of the Fourth Amendment claims (although relevant for Hinds's other claims discussed below). For that reason, the Court declines to restate and reiterate the extensive Fourth Amendment analysis conducted in that case; the conclusions and analysis in the prior Opinion & Order with respect to Officer Hess's liability under the Fourth Amendment are incorporated in this Opinion. Suffice to say, for the reasons set forth in the prior Opinion & Order, Hinds was not seized within the meaning of the Fourth Amendment when Officer Hess fired into the windshield of the vehicle. (*See id.* at 25.) Moreover, while Hinds was seized by way of Officer Hess stepping out into the road in an attempt to stop Henry's vehicle, Officer Hess is entitled to qualified immunity with respect to that claim. (*See id.* at 37–

---

[9] The Court will not examine here whether some other criminal statute may have provided a basis for the arrest.

38.)  Officer Hess's Motion is therefore granted with respect to the Fourth Amendment claims raised against him by Hinds pursuant to 42 U.S.C. § 1983.[10]

### 4.  Malicious Prosecution

#### a.  Applicable Law

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law."  *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted).  To prevail on a malicious prosecution claim under New York law, the plaintiff must show: "(1) the defendant initiated a prosecution against [the] plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice, and (4) the matter terminated in [the] plaintiff's favor." *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (alterations and internal quotation marks omitted).  "[A] grand jury indictment gives rise to a presumption that probable cause exists and a claim for malicious prosecution in relation to the crimes described in the indictment thereby is defeated."  *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006).  To transform a state law claim for malicious prosecution into a § 1983 claim, the plaintiff must allege "some deprivation of liberty consistent with the concept of 'seizure.'"  *Singer*, 63 F.3d at 116.

The Second Circuit has clarified that "probable cause" in the malicious prosecution context means "probable cause to believe that [the prosecution] could succeed."  *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).  Thus, a court must be careful not to "conflate probable cause to arrest with probable cause to believe that [a criminal defendant] could be successfully prosecuted.  Only the latter kind of probable cause is at issue with respect to [a]

---

[10] Unlike Cox, Hinds did not raise a substantive due process claim.

malicious prosecution claim." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir.

1999).  If, however, "probable cause existed at the time of the arrest and the plaintiff offers no

additional facts to show that it dissipated post-arrest, then the claim for malicious prosecution

cannot be maintained."  *Jimenez v. City of New York*, No. 15-CV-3257, 2016 WL 1092617, at *4

(E.D.N.Y. Mar. 21, 2016); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir.

1996) ("[E]ven when probable cause is present at the time of arrest, evidence could later surface

which would eliminate that probable cause.  In order for probable cause to dissipate, the

groundless nature of the charges must be made apparent by the discovery of some intervening

fact." (citations and internal quotation marks omitted)).

### b.  Termination in Favor

Defendants argue, with respect to all Plaintiffs against whom they are moving for

summary judgment on their malicious prosecution claims, that the claims must be dismissed

because the criminal proceedings did not terminate in their favor.  (*See, e.g.*, Defs.' Garcia Mem.

9–10.)  Specifically, Defendants argue that because the charges were dismissed upon motion by

the District Attorney's Office in the interest of justice and because the charges were not baseless,

the matter did not terminate in Plaintiffs' favor for purposes of a malicious prosecution claim.

(*See id.*)

In support, Defendants cite the New York Court of Appeals' decision in *Cantalino v.

Danner*, 754 N.E.2d 164 (N.Y. 2001), for the proposition that "[a] dismissal in the interest of

justice constitutes a favorable termination where the charges are dismissed where they are

groundless; however, a dismissal in the interest of justice does not constitute a favorable

termination where the charges are dropped as an act of mercy or as a favor to the accused."

(Defs.' Garcia Mem. 9.)  But this summary overstates the holding in *Cantalino*.  The court in

*Cantalino* did not hold that a dismissal in the interest of justice constitutes a favorable termination *only* where the charges are dismissed as groundless.  Rather, the court reaffirmed the established principle that "any termination of a criminal prosecution, such that the criminal charges may not be brought again, qualifies as a favorable termination, so long as the circumstances surrounding the termination are not inconsistent with the innocence of the accused."  *Cantalino*, 754 N.E.2d at 167.  To be sure, the court did note several types of termination that are not "favorable" within the meaning of a malicious prosecution claim:

> For instance, where a prosecution fails to go forward because of misconduct by the accused preventing a proper trial, the termination cannot be considered favorable.  Similarly, if a prosecution ends because of a compromise with the accused, the termination is not favorable.  The same rule applies if charges are dismissed out of mercy, since mercy presupposes the guilt of the accused.

*Id.*  As an example of a situation in which charges were dismissed out of mercy, thus precluding any claim for malicious prosecution, the court cited *Ward v. Silverberg*, 652 N.E.2d 914 (N.Y. 1995).  There, according to the court in *Cantalino*, "the [c]riminal [c]ourt . . . recognized that [the] plaintiff had committed the charged conduct, [but] it did not believe a criminal sanction was appropriate."  754 N.E.2d at 168.  "Such a disposition," according to the Court of Appeals, "is fundamentally inconsistent with the accused's innocence."  *Id.*

To be sure, some language in *Ward* may be read to suggest that a malicious prosecution claim is unavailable under state law any time the plaintiff fails "to establish that the dismissal in any way involved a determination on the merits of her guilt or innocence or that the prosecutor lacked a reasonable foundation for the charges," because "the question of guilt or innocence remain[s] unanswered."  652 N.E.2d at 914–15.  To the extent such a statement could be interpreted to mean that any dismissal other than one on the merits is insufficient to support a malicious prosecution claim, that suggestion has been squarely rejected by *Smith-Hunter v.*

*Harvey*, 734 N.E.2d 750, 753 (N.Y. 2000), and *Cantalino*, 754 N.E.2d at 168. *See D'Olimpio v. Crisafi*, 718 F. Supp. 2d 357, 368 (S.D.N.Y. 2010) (rejecting the defendants' argument that "the dismissal of the criminal charges against [the plaintiff] in the interest of justice [did] not constitute a favorable termination" because "the New York Court of Appeals has clarified that there is no per se rule that a dismissal in the interest of justice can never constitute a favorable termination," and there were "no facts in the record indicating that the termination of the criminal charges was inconsistent with [the plaintiff's] innocence" (internal quotation marks omitted)).

Here, there was no acknowledgement or suggestion by the Town Court that Plaintiffs were guilty of the charges of which they were accused. In fact, the limited excerpts provided to the Court indicate that Plaintiffs maintained their innocence throughout the proceeding, and the Town Court made no judgment, formal or informal, about the merits of the case:

> Now, I have no reason to doubt, disagree with [Plaintiffs'] representations as to the video. I haven't looked at it. I haven't taken any evidence in this case. Now that I'm dismissing this case I won't take any evidence and I'm not going to take an additional exhibit for the record.

(Garcia Zelman Decl. Ex. 3, at 10.) Finally, to eliminate any doubt, the Town Court clarified that "[t]hese gentlemen who came in here presumed innocent will leave here innocent." (*Id.* at 11.) Such a statement is plainly not inconsistent with the innocence of Plaintiffs.

It does not aid Defendants that they contend it was the District Attorney's Office's intention to afford mercy to Plaintiffs. No reading of *Cantalino* or *Smith-Hunter* supports the notion that a district attorney's office may maliciously bring a case without probable cause, require the defendants to make multiple court appearances, and then avoid any liability for its conduct merely by affording "mercy" to the defendants without admitting their innocence. The reference to "mercy" in *Cantalino* plainly refers to the mercy of the *court*, not the subjective

intentions of the prosecuting office. Here, there is no indication that the Town Court was exercising mercy in favor of plainly guilty parties; rather, the Town Court expressly reserved any judgment regarding the evidence and proclaimed Plaintiffs innocent as a matter of law.

Defendants also invoke the written decision of the Town Court, claiming that one paragraph in particular supports their position:

> It is not disputed that all four defendants were emotionally distraught at the sudden, unexpected shooting of their friend and teammate and that this heightened emotional state compelled them to act against their better judgment. The sudden, emotional reaction of these defendants to the death of their friend is a significant factor in support of a dismissal in the interest of justice. There is no allegation that their conduct was premeditated. While not necessarily excusable, it is highly understandable. Furthermore, none of their conduct resulted in a physical injury to either the police nor any civilian. From the agreed upon facts, a dismissal will not negatively impact the safety or welfare of the community, nor the public's confidence in the criminal justice system. These defendants have no prior criminal history and are charged with misdemeanors which involve no physical injury to others.

(Garcia Sumner Decl. Ex. E ¶ 9.) But this passage offers no opinion on the guilt of Plaintiffs for the conduct with which they were charged, and the Town Court made clear elsewhere that "there [were] disparate and differing views of the facts and circumstances surrounding the issuance and validity of the charges filed," but that it would "take[] no position on those allegations of fact, and [would] neither accept[] nor reject[] them." (*Id.* ¶ 4.) The only thing the Parties agreed upon was the emotionally-charged atmosphere in which the allegations arose, not the truth of the allegations or their legal sufficiency.

The record is absent of any evidence that the dismissal of criminal charges was inconsistent with the innocence of Plaintiffs. In light of these circumstances, the Court concludes that Plaintiffs have adequately shown that the criminal matters terminated in their favor.

### c. Probable Cause

Defendants additionally argue that the malicious prosecution claims must be dismissed because there was probable cause to support the charges levied. (*See, e.g.*, Defs.' Garcia Mem. 8–9.) The Court will address this argument with respect to each Plaintiff at issue.

### i. Garcia

Defendants first argue that because probable cause existed (or arguably existed) at the time of Garcia's arrest, and there are no intervening facts to suggest that probable cause dissipated, summary judgment on the malicious prosecution claim is appropriate. (*See id.* at 8–9.) In response, Garcia argues only that "there was no probable cause for the arrest on a charge of disorderly conduct or obstruction of governmental administration." (Pl's Garcia Opp'n 16.)

As noted above, it is well settled that if "probable cause existed at the time of the arrest and the plaintiff offers no additional facts to show that it dissipated post-arrest, then the claim for malicious prosecution cannot be maintained." *Jimenez*, 2016 WL 1092617, at *4. Here, Garcia has not offered any facts suggesting that the arguable probable cause that existed to arrest him for obstruction of governmental administration on the evening of October 16, 2010 dissipated between then and the time the prosecution was initiated such that the finding of qualified immunity with respect to the underlying arrest would not extend to the malicious prosecution claim. *See Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 554–55 (E.D.N.Y. 2015) (holding that because the officer had arguable probable cause to arrest and there was "no contention . . . that new facts were brought to light following [the] plaintiffs' arrest and before the initiation of prosecution," the defendants were entitled to qualified immunity for the malicious prosecution claim); *Thomas v. City of New York*, No. 11-CV-2219, 2013 WL 1325186, at *9 (S.D.N.Y. Apr. 2, 2013) (holding that the defendants were entitled to qualified immunity

on the malicious prosecution claim for the same reasons as under the false arrest claim because the plaintiff had "provided no evidence that [the] [d]efendants learned of any intervening facts between the arrest and the initiation of criminal proceedings the following day that could eliminate probable cause"), *aff'd*, 562 F. App'x 58 (2d Cir. 2014); *Corona v. Lunn*, No. 00-CV-7330, 2002 WL 550963, at *8 (S.D.N.Y. Apr. 11, 2002) (holding that where there was at least arguable probable cause to arrest the plaintiff and where the plaintiff did "not argue that any such facts later came to light," or "that a reasonable person would have made further inquiry based on any post-arrest developments," summary judgment was appropriate "essentially for the same reasons" as the false arrest claim), *aff'd*, 56 F. App'x 20 (2d Cir. 2003). Accordingly, Defendants are entitled to qualified immunity with respect to the malicious prosecution claim arising out of the charge for obstruction of governmental administration.

With respect to the charge for disorderly conduct, as noted above, such a charge may be sustained only where the suspect is "congregat[ing]" in a public place with "at the very least three persons at a given time and place, including the individual who was arrested." *Kass*, 2017 WL 3122289, at *7. Taking as true his version of the facts, Garcia never congregated with any individuals at the scene, much less with two other individuals. And, in any event, Garcia was never given an order to disperse with which he failed to comply. As he was walking to Henry's vehicle, Garcia was told by an officer to get back, and he complied. (*See* Garcia Dep. 196–200.) Under his version of events, Garcia was not arrested attempting to reenter the same area, but rather was arrested as he approached an area of the sidewalk where Delpeche was standing. (*See id.* at 235–37.) Garcia thus never defied an order to disperse, and there was no probable cause to prosecute Garcia for disorderly conduct.

Defendants contend also that summary judgment is nonetheless appropriate because Garcia "cannot establish that Defendants acted with actual malice." (Defs.' Garcia Mem. 9.) But Garcia is correct that "a lack of probable cause generally creates an inference of malice." *Manganiello*, 612 F.3d at 163 (2d Cir. 2010) (alteration and internal quotation marks omitted). While the trier of fact may ultimately conclude that Defendants did not act with malice, the Court cannot so conclude as a matter of law.

Finally, Defendants argue that Defendant Lieutenant Lowenstein, who issued Garcia a police appearance ticket based on information provided by Officer Cusano, cannot be held liable for malicious prosecution. (*See* Defs.' Garcia Mem. 8.) Garcia does not oppose this contention, (*see* Pl.'s Garcia Opp'n 16–19), and the Court therefore deems Garcia's claim against Lowenstein for malicious prosecution abandoned, *see Jackson*, 766 F.3d at 195.

Accordingly, Defendants' Motion is granted insofar as it pertains to Garcia's malicious prosecution claims relating to the charge for obstruction of governmental administration and against Lowenstein, but denied in all other respects.

### ii.  Delpeche and Parker

With respect to Delpeche and Parker, Defendants again argue that the existence of probable cause during the arrest gives rise to probable cause to prosecute. (*See* Defs.' Delpeche Mem. 13–14; Defs.' Parker Mem. 11–13.) The Court has already determined, however, that taking Plaintiffs' version of the facts as true, the arresting officers lacked probable cause or arguable probable cause to arrest either Delpeche or Parker. Defendants' argument here is thus without merit.

Defendants contend also, again, that there is no evidence of malice. (*See* Defs.' Delpeche Mem. 14; Defs.' Parker Mem. 13.) Again, the absence of probable cause gives rise to an

inference of malice.  *See Manganiello*, 612 F.3d at 163.  Defendants' argument is thus without merit.

Finally, Defendants contend that Lowenstein cannot be held liable for issuing a desk appearance ticket based on the information provided by the arresting officers.  (*See* Defs.' Delpeche Mem. 13–14; Defs.' Parker Mem. 12–13.)  As Plaintiffs have not opposed this argument, (*see* Pl.'s Opp'n to Defs.' Mot. for Partial Summ. J. 18–21 (Dkt. No. 257, 11-CV-7260 Dkt.); Pl.'s Parker Opp'n 20–23), the claims against Lowenstein for malicious prosecution are deemed abandoned.

Accordingly, Defendants' Motion with respect to Delpeche's and Parker's malicious prosecution claim is granted as to Lowenstein, but denied in all other respects.

### iii.  Romanick

As with the other Plaintiffs, Defendants argue that Romanick's malicious prosecution claims must be dismissed because there was probable cause to arrest him for criminal mischief (the crime for which he was ultimately charged) and that probable cause did not dissipate prior to the filing of the misdemeanor information.  (*See* Defs.' Romanick Mem. 9–10.)  Romanick argues that there was no probable cause to arrest at the time of the incident and that the testimony of Romanick and Arciero that Romanick was pushed into the window by Arciero creates an issue of disputed fact.  (*See* Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. 15 (Dkt. No. 257, 11-CV-2767).)

As with his argument regarding false arrest, Romanick's argument here is off point.  The relevant question is not whether Romanick is actually guilty of the offense of criminal mischief, but rather whether Defendants had probable cause to believe that a prosecution against Romanick would be successful.  At the time the criminal complaint against Romanick was filed,

Van Ostrand had already provided a detailed eyewitness statement detailing Romanick's intentional and reckless behavior that led to the destruction of the bagel shop. (*See* Romanick Zelman Decl. Ex. 6.) It may be the case, as Romanick contends, that the incident was in fact entirely Arciero's fault, and that Romanick committed no criminal conduct. But courts have consistently recognized that "the existence of such conflicting evidence does not vitiate the probable cause established by an eyewitness identification." *Creighton*, 2017 WL 636415, at *27; *see also Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 229 (S.D.N.Y. 2006) (holding that while the plaintiff may have been "correct that a physical assault [by the plaintiff] was not the only possible explanation," "probable cause was created by the reasonably reliable information given to the defendant by . . . the resident's treating physician [and] . . . an alleged eyewitness"). Moreover, Romanick has offered no reason why Defendants were not entitled to rely on the eyewitness statement of Van Ostrand, which squarely implicated Romanick. *See Marshall v. City of New York*, 198 F. Supp. 3d 224, 226–27 (E.D.N.Y. 2016) (holding that the false arrest and malicious prosecution claims failed because "a victim and an eyewitness identified [the] [p]laintiff as one of the attackers, and there was no reason to doubt their veracity"); *see also Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." (citation omitted)).

In light of the facts available to Officer Winsman and the subsequent eyewitness statement of Van Ostrand, the Court agrees with Defendants that there was probable cause to prosecute Romanick for criminal mischief. Moreover, even if there could be any debate, Defendants would be entitled to qualified immunity, because reasonable officers could surely disagree as to the existence of probable cause in these circumstances.

Accordingly, Defendants' Motion regarding Romanick's malicious prosecution claims is granted.

### 5.  Notice of Claim

Officer Hess argues that the Court lacks jurisdiction over any of the state claims asserted against him by Hinds because the notice of claim filed did not list Officer Hess as a respondent or specifically assert any theories of liability against him.  (*See* Hess Hinds Mem. 23–24.)  Hinds argues that the notice of claim "specified the nature of the claim in detail, including but not limited to, excessive force, intentional and/or negligent infliction of severe emotional distress, and assault," and also that Officer Hess is "specified by name under 'Manner in Which Claim Arose' as the Pleasantville Police Department officer who 'jumped in front of the moving motor vehicle with his gun drawn.'"  (Pl.'s Mem. of Law in Opp'n to Defs.' Mots. for Summ. J. ("Hess Hinds Opp'n") 28–29 (Dkt. No. 278, 11-CV-7265 Dkt.).)

N.Y. Gen. Mun. Law § 50-e(1) provides that any suit brought against a public corporation or any officer, appointee, or employee thereof must be preceded by a notice of claim filed with the municipality within 90 days after the claim arises.  "[I]n a federal court, state notice-of-claim statutes apply to *state*-law claims."  *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999).  In New York, "filing a [n]otice of [c]laim with a municipality is a condition precedent to commencing a tort claim against any employee of that municipality." *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 396 (S.D.N.Y. 2013); *see also Rose v. County of Nassau*, 904 F. Supp. 2d 244, 247–48 (E.D.N.Y. 2012) ("Under New York law, a notice of claim is a condition precedent to bringing personal injury actions against a municipal corporation and its officers, appointees and employees.").  The notice of claim requirement is "construed strictly by New York state courts," and "[f]ailure to comply with these requirements

ordinarily requires a dismissal for failure to state a cause of action." *Hardy*, 164 F.3d at 793–94 (internal quotation marks omitted).

With respect to whether individual defendants must be named as respondents in a notice of claim, New York appellate courts are divided on the issue, with the majority holding that there is no such requirement. *Compare Alvarez v. City of New York*, 22 N.Y.S.3d 362, 363 (App. Div. 2015) (holding that N.Y. Gen. Mun. Law § 50-e requires individual defendants to be specifically named in the notice of claim), *with Blake v. City of New York*, 51 N.Y.S.3d 540, 545 (App. Div. 2017) (holding that under N.Y. Gen. Mun. Law § 50-e, "[l]isting the names of the individuals who allegedly committed the wrongdoing is not required"), *and Pierce v. Hickey*, 11 N.Y.S.3d 321, 323 (App. Div. 2015) (holding that the lower court had "correctly concluded that [the] plaintiff was not required to individually list [the defendant] on the underlying notice of claim"), *and Goodwin v. Pretorious*, 962 N.Y.S.2d 539, 546 (App. Div. 2013) (overturning prior precedent holding that individual defendants must be named in a notice of claim). Federal courts are also divided. *Compare, e.g.*, *Johnson v. City of New York*, No. 15-CV-8195, 2017 WL 2312924, at *7 (S.D.N.Y. May 26, 2017) (dismissing state claims against individual defendants because the "notice of claim named as defendants only 'City of New York' and 'New York City Police Department'"), *and DiRuzza v. Village of Mamaroneck*, No. 14-CV-1776, 2014 WL 6670101, at *2 (S.D.N.Y. Oct. 6, 2014) (dismissing state claims against an individual defendant because the defendant was "not identified as a respondent in the notice of claim"), *aff'd*, 685 F. App'x 34 (2d Cir. 2017), *and DC v. Valley Cent. Sch. Dist.*, No. 09-CV-9036, 2011 WL 3480389, at *2 (S.D.N.Y. June 29, 2011) ("Because [the] defendants . . . were not named as respondents in the notice of claim, [the] plaintiffs cannot assert state law claims against them."), *with Reyes v. City of New York*, 992 F. Supp. 2d 290, 302 (S.D.N.Y. 2014) (declining to follow

the First Department's rule and holding that it was "irrelevant that [the] [p]laintiff's notice of claim only named [a single individual]"), *and Chamberlain*, 986 F. Supp. 2d at 397 ("As long as the [n]otice of [c]laim includes information sufficient to enable the city to investigate and identify the municipal employees involved, a failure to specifically name individual defendant employees should not bar suit against them." (citation and internal quotation marks omitted)).

"When the highest state court has not ruled directly on [an] issue presented, a federal court must make its best estimate as to how the state's highest court would rule in the case." *Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 431 (S.D.N.Y. 1999). In light of the fact that three out of the four New York appellate departments have declined to require plaintiffs to specifically name each individual defendant as a respondent in the notice of claim, and in light of the New York Court of Appeals' directive that "[t]he test of the sufficiency of a [n]otice of [c]laim is merely whether it includes information sufficient to enable the city to investigate" and that "[n]othing more may be required," *Brown v. City of New York*, 740 N.E.2d 1078, 1080 (N.Y. 2000) (citation and internal quotation marks omitted), the Court concludes that the requirement imposed by the First Department to specifically name each individual defendant as a respondent in the notice of claim is unlikely to be adopted by the New York Court of Appeals. Hinds's notice of claim made clear that it was Officer Hess who fired into the windshield of Henry's vehicle, and there can be little question that the Village of Pleasantville had ample notice of the need to investigate the conduct of Officer Hess.

Accordingly, because there is no question that the Village of Pleasantville was on notice of the need to investigate Officer Hess's conduct, Officer Hess's Motion is denied in this respect.

### 6. Assault

Next, the Court will address the various claims for assault under state law. Under New York law, "an assault is an intentional placing of another person in fear of imminent harmful or offensive contact." *Jackson v. City of New York*, 939 F. Supp. 2d 219, 233 (E.D.N.Y. 2013) (internal quotation marks omitted) (citing *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993)). "The plaintiff must show that the defendant intended either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact." *Wahlstrom v. Metro-North Commuter R.R. Co.*, 89 F. Supp. 2d 506, 528 (S.D.N.Y. 2000) (internal quotation marks omitted). The Parties agree that "[f]ederal excessive force claims and state law assault and battery claims against police officers are nearly identical." *Graham v. City of New York*, 928 F. Supp. 2d 610, 624 (E.D.N.Y. 2013). To prevail, a plaintiff must "prove that [the officer's] conduct was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties." *Nimley v. City of New York*, 414 F.3d 381, 391 (2d Cir. 2005).

### a. LaRoche

Defendants contend that LaRoche's assault claim, the sole claim that LaRoche has defended in these Motions, must be dismissed because the actions of Officers Castagna and Jacobsen were "objectively reasonable under the circumstances." (Mem. of Law in Supp. of the Town of Mount Pleasant & County of Westchester Defs.' Mot. for Summ. J. 20 (Dkt. No. 241, 11-CV-7261 Dkt.).) Specifically, Defendants contend that it was reasonable for Officers Castagna and Jacobsen "to draw their weapons so that they could potentially defend themselves or others after hearing gunshots fired from an unknown source." (*See id.*)

With respect to Officer Jacobsen, the Court agrees with Defendants that the record as construed in LaRoche's favor does not support a claim for assault. At the time LaRoche approached Officer Jacobsen, he was in the process of handcuffing Hinds, who had just exited a vehicle that had been involved in a collision with a police officer during which multiple gunshots had been fired. (*See* LaRoche Dep. 476–79.) Officer Jacobsen reasonably used his firearm to secure what could have been a potentially dangerous suspect (although the facts in retrospect prove otherwise), and turned his weapon on LaRoche only when LaRoche interrupted the arrest of Hinds. (*See id.* at 477–79.) Police officers are entitled to brandish their weapons in situations where the circumstances suggest the possibility of danger. *See Rincon v. City of New York*, No. 03-CV-8276, 2005 WL 646080, at *5 (S.D.N.Y. Mar. 21, 2005) (holding that it was not unreasonable for officers to draw their weapons during a search where "[t]he warrant stated that the [sic] possibility of weapons in the apartment, making it reasonable for the officers to draw their weapons for safety purposes"); *see also Linson v. City of New York*, 951 N.Y.S.2d 167, 168 (App. Div. 2012) (holding that the brandishing of a weapon was not unreasonable where the officer "who pointed his weapon at [the plaintiff] did so for only as long as it took the [officers] to secure the apartment by ensuring that there were no immediate threats in the apartment to the safety of any officer"). No reasonable trier of fact could conclude that it was unreasonable for Officer Jacobsen, in the aftermath of a shooting, to brandish his weapon to effect an arrest in a dangerous and fast-moving situation, or to briefly redirect his attention and his weapon to an unknown individual interfering with that arrest.

For Officer Castagna, the issue is closer. Unlike Officer Jacobsen, Officer Castagna was not in the process of arresting a potentially dangerous suspect at the time he brandished his weapon. (*See* LaRoche Dep. 721–22.) Rather, Officer Castagna testified that his reason for

brandishing the weapon was that he feared someone might exit Henry's vehicle with a weapon. (*See* Castagna Dep. 122.)  While such a belief is, perhaps, not unreasonable, the deposition testimony and video footage indicate that Officer Castagna directed his weapon at the crowd members on the sidewalk, and not in the direction of Henry's vehicle.  (*See* LaRoche Dep. 721–22; *see also* Gallo Zelman Decl. Ex. 5.)  Moreover, the evidence shows not that Officer Castagna merely had his gun out as he directed crowd members away, but that he raised it in what LaRoche described as a "two-hand combat stance" and directed it at people on the sidewalk, a description not inconsistent with the video evidence.  (*See* LaRoche Dep. 722; Gallo Zelman Decl. Ex. 5.)  Under these circumstances, it cannot be said that no reasonable trier of fact could conclude that Officer Castagna's actions were unreasonable.

Defendants' Motion is therefore granted with respect to LaRoche's claim against Officer Jacobsen, but denied with respect to the claim against Officer Castagna (and, by virtue of respondeat superior, the Town of Mount Pleasant).

### b.  Gallo

Gallo's interaction with Officer Castagna, depicted in full in the cell-phone video, is largely indistinguishable from LaRoche's interaction with Officer Castagna.  Thus, for similar reasons, summary judgment is not appropriate here.  Specifically, while Officer Castagna may have been justified in drawing his weapon in light of the chaotic and potentially dangerous circumstances at the time, the record as construed in the light most favorable to Plaintiffs offers no justification for his decision to point his weapon directly at Gallo.  (*See* Gallo Zelman Decl. Ex. 5.)  While not dispositive, Officer Jacobsen, after viewing the cell-phone footage, testified that he saw no justification for Officer Castagna to point his weapon at the individuals on the sidewalk who were standing near Hinds.  (*See* Jacobsen Dep. 202.)  Accordingly, for the same

reasons discussed above, Defendants' Motion is denied with respect to Gallo's assault claim against Officer Castagna and the Town of Mount Pleasant.

### c. Hinds

With respect to Hinds' claim for assault again Officer Hess, Officer Hess argues that the shooting of his weapon, which never struck Hinds, did not put Hinds in reasonable apprehension of harmful contact because Hinds testified that he never saw Officer Hess holding a gun and did not realize during the shooting that Officer Hess had fired at the vehicle. (*See* Hess Hinds Mem. 25–26.) As Hinds rightly points out, (*see* Hess Hinds Opp'n 31), Officer Hess overstates the record. Hinds testified that he did not *see* a gun while he was in Henry's vehicle, and that he did not immediately know what had caused the damage to the windshield, (*see* Hinds Dep. 300–02), but Hinds also testified that he heard what he believed were shots coming through the windshield, (*see id.* at 303), and his affidavit submitted in opposition to the pending Motions clarified that he realized Officer Hess was wielding a gun after the shots were fired, (*see* Hinds Zelman Decl. Ex. 24 ¶ 10). The facts construed in the light most favorable to Hinds makes plain that he was aware of the danger posed by Officer Hess's firing of the weapon, and he felt threatened as a result, (*see id.* ¶ 13).[11]

Turning to the reasonableness of Officer Hess's actions, this Court has already addressed the objective reasonableness of Officer Hess's decision to discharge his weapon into a moving vehicle under the facts as alleged by Plaintiffs. (*See* Cox Op. 41–44.) Here, the same precise conduct is at issue, and the result must be the same for the same reasons. Specifically, Officer Hess is not entitled to summary judgment at this phase because the facts alleged by Plaintiffs,

---

[11] Perhaps as evidence of the weakness of this argument, Officer Hess did not pursue it in his reply papers. (*See* Reply Mem. of Law in Further Supp. of Def. Aaron Hess' Mot. for Summ. J. 19–20 (Dkt. No. 299, 11-CV-7265 Dkt.).)

supported by their testimony, reflect that Officer Hess lunged into the roadway, giving Henry virtually no time to decelerate or stop the vehicle, and immediately began firing into the windshield. (*See id.*) For all of the reasons described in the prior Opinion & Order, Officer Hess's Motion with respect to the state assault claims is denied.

### 7. Intentional Infliction of Emotional Distress

Finally, the Court turns to the claims for intentional infliction of emotional distress.

In New York, the elements of a claim for intentional infliction of emotional distress ("IIED") are: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993). "New York courts have imposed a very high threshold for intentional infliction of emotional distress claims, requiring that the conduct must be so outrageous and extreme as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Druschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 314 (S.D.N.Y. 2005) (internal quotation marks omitted).

Defendants argue that the IIED claims must be dismissed because any emotional damages may be vindicated under their claims for battery, false arrest, and malicious prosecution. (*See, e.g.*, Defs.' Garcia Mem. 24; Hess Hinds Mem. 26.) Plaintiffs do not rebut this claim. (*See, e.g.*, Pl.'s Garcia Opp'n 19–20; Hess Hinds Opp'n 32–33.)

Federal courts in the Second Circuit agree that "no intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability." *Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) (alteration and internal quotation marks omitted); *see also Lopez v. City of New York*, No. 14-CV-1660,

2014 WL 5090041, at *4 (S.D.N.Y. Oct. 10, 2014) ("New York law considers IIED a theory of recovery that is to be invoked only as a last resort, and requires dismissal of an IIED claim based on conduct that falls within the ambit of other traditional tort liability." (internal quotation marks omitted)); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 528 F. Supp. 2d 303, 312 (S.D.N.Y. 2007) ("[R]elief [under IIED] is limited because a cause of action for intentional infliction of emotional distress should not be entertained where the conduct complained of falls well within the ambit of other traditional tort liability." (internal quotation marks omitted)). For this reason, courts have not hesitated to dismiss IIED claims where "the alleged conduct fits well within the traditional tort theories of false arrest, malicious prosecution, and assault and battery." *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 405 (S.D.N.Y. 2009); *see also Lopez*, 2014 WL 5090041, at *4 (dismissing IIED claim where "[t]he conduct underlying [the plaintiff's] IIED claim [was] entirely embraced by the traditional tort claims of false arrest, false imprisonment, malicious prosecution, and battery"); *Lee v. McCue*, 410 F. Supp. 2d 221, 227 (S.D.N.Y. 2006) (dismissing claim for negligent infliction of emotion distress because the "plaintiff's causes of action for battery and false arrest provide[d] a complete source of recovery for his injuries").

Here, the conduct complained of—Defendants' actions in allegedly falsely arresting, using excessive force on, and maliciously prosecuting Plaintiffs—plainly falls within the torts of false arrest, malicious prosecution, and assault and battery. The claims for IIED are duplicative and, based on the longstanding and unbroken precedent cited above, should be dismissed. Defendants' Motions are therefore granted with respect to Plaintiffs' claims for IIED.

## III.  Conclusion

For the foregoing reasons, Defendants' Motions are granted in part and denied in part.

Only the following claims remain as to each Plaintiff:

- Garcia (11-CV-7258)
  - Federal and state malicious prosecution claims against Officer Cusano and the County of Westchester;
  - Federal excessive force and state assault and battery claims against Officer Cusano and the County of Westchester.

- Delpeche (11-CV-7260)
  - Federal and state false arrest claims against Officer Bosan and the County of Westchester.
  - Federal and state malicious prosecution claims against Officer Bosan and the County of Westchester.
  - Federal excessive force and state assault and battery claims against Officer Bosan and the County of Westchester.

- LaRoche (11-CV-7261)
  - State assault claims against Officer Castagna and the Town of Mount Pleasant.

- Gallo (11-CV-7262)
  - State assault claims against Officer Castagna and the Town of Mount Pleasant.

- Parker (11-CV-7264)
  - Federal and state false arrest claims against Officer Bosan and the County of Westchester;
  - Federal and state malicious prosecution claims against Officer Bosan and the County of Westchester;
  - Federal excessive force and state assault and battery claims against Officer Bosan and the County of Westchester.

- Hinds (11-CV-7265)
  - State assault claims against Officer Hess and the Village of Pleasantville;
  - Federal and state false arrest claims against Officer Jacobsen and the Town of Mount Pleasant;
  - Federal excessive force and state assault and battery claims against Officer Jacobsen and the Town of Mount Pleasant.

- Romanick (11-CV-7267)
  - o Federal excessive force and state assault and battery claims against Officer Winsman and the County of Westchester.

All other claims are dismissed.[12] The Court will hold a conference on January 3, 2018 at 11:00 AM to discuss the status of the cases. The Clerk of Court is respectfully directed to terminate the pending Motions. (*See* Dkt. No. 291, 11-CV-7258 Dkt.; Dkt. No. 244, 11-CV-7260; Dkt. No. 240, 11-CV-7261; Dkt. No. 229, 11-CV-7262; Dkt. No. 254, 11-CV-7264 Dkt.; Dkt. Nos. 254, 258, 262, 11-CV-7265; Dkt. No. 243; 11-CV-7267 Dkt.)

SO ORDERED.

DATED:    December ⊔ , 2017
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[12] This includes all federal claims brought against the Town of Mount Pleasant and the County of Westchester, which, as discussed above, have been abandoned by Plaintiffs in opposition to these Motions.